IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2017 Term

**FILED**

**MAY 26, 2017**
**Released at 3:00 p.m.**
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS

No. 16-0136

PATRICK D. LEGGETT, et al.,
Plaintiffs Below, Petitioners,

v.

EQT PRODUCTION COMPANY, et al.,
Defendants Below, Respondents.

Certified Questions from the
United States District Court for the Northern District of West Virginia
The Honorable Fredrick P. Stamp, Jr., Judge
Case No. 1:13-cv-00004-FPS

CERTIFIED QUESTIONS ANSWERED

Rehearing Granted: January 25, 2017
Submitted Upon Rehearing: May 2, 2017
Filed: May 26, 2017

Marvin W. Masters, Esq.
Richard A. Monahan, Esq.
April D. Ferrebee, Esq.
The Masters Law Firm lc
Charleston, West Virginia
*and*
Michael W. Carey, Esq.
Carey, Scott, Douglas & Kessler, PLLC
Charleston, West Virginia
Attorneys for Petitioners

David K. Hendrickson, Esq.
Carl L. Fletcher, Jr., Esq.
Hendrickson & Long PLLC
Charleston, West Virginia
Attorneys for Respondents

Howard M. Persinger, III, Esq.
Persinger & Persinger, L. C.
Charleston, West Virginia
Attorney for Amici Curiae
West Virginia Land and Mineral Owners'
Association, West Virginia Royalty Owners'
Association, West Virginia Farm Bureau,
National Association of Royalty Owners,
Appalachia, and Lewis Maxwell Oil & Gas LLC

Timothy M. Miller, Esq.
Mychal S. Schulz, Esq.
Katrina N. Bowers, Esq.
Babst, Calland, Clements & Zomnir, P. C.
Charleston, West Virginia
Attorneys for Amici Curiae
West Virginia Oil and Natural Gas Association
and West Virginia Independent Oil and Gas
Association

Michael J. Hammond, Esq.
Dodaro, Matta & Cambest, P. C.
Canonsburg, Pennsylvania
Attorney for Amicus Curiae Bounty Minerals, LLC

CHIEF JUSTICE LOUGHRY delivered the Opinion of the Court.
JUSTICE WORKMAN concurs and reserves the right to file a concurring opinion.
JUSTICE DAVIS dissents and reserves the right to file a separate opinion.

SYLLABUS BY THE COURT

1.　"'A *de novo* standard is applied by this court in addressing the legal issues presented by certified question from a federal district or appellate court.' Syl. Pt. 1, *Light v. Allstate Ins. Co.*, 203 W.Va. 27, 506 S.E.2d 64 (1998)." Syl. Pt. 2, *Aikens v. Debow*, 208 W.Va. 486, 541 S.E.2d 576 (2000).

2.　"Where the issue on an appeal . . . is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. Pt. 1, in part, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995).

3.　"The primary rule of statutory construction is to ascertain and give effect to the intention of the Legislature." Syl. Pt. 8, *Vest v. Cobb*, 138 W.Va. 660, 76 S.E.2d 885 (1953).

4.　"Judicial interpretation of a statute is warranted only if the statute is ambiguous and the initial step in such interpretative inquiry is to ascertain the legislative intent." Syl. Pt. 1, *Ohio County Comm'n v. Manchin*, 171 W.Va. 552, 301 S.E.2d 183 (1983).

5.　"Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation." Syl. Pt. 2, *Crockett v. Andrews*, 153 W.Va. 714, 172 S.E.2d 384 (1970).

6. "When a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute." Syl. Pt. 5, *State v. General Daniel Morgan Post No. 548, V.F.W.*, 144 W.Va. 137, 107 S.E.2d 353 (1959).

7. "The basic and cardinal principle, governing the interpretation and application of a statute, is that the Court should ascertain the intent of the Legislature at the time the statute was enacted, and in the light of the circumstances prevailing at the time of the enactment." Syl. Pt. 1, *Pond Creek Pocahontas Co. v. Alexander*, 137 W.Va. 864, 74 S.E.2d 590 (1953).

8. Royalty payments pursuant to an oil or gas lease governed by West Virginia Code § 22-6-8(e) (1994) may be subject to pro-rata deduction or allocation of all reasonable post-production expenses actually incurred by the lessee. Therefore, an oil or gas lessee may utilize the "net-back" or "work-back" method to calculate royalties owed to a lessor pursuant to a lease governed by West Virginia Code § 22-6-8(e). The reasonableness of the post-production expenses is a question for the fact-finder.

LOUGHRY, Chief Justice:

This case is before the Court upon certified questions presented by the United States District Court for the Northern District of West Virginia regarding whether this Court's decision in *Tawney v. Columbia Natural Resources, L.L.C.*, 219 W. Va. 266, 633 S.E.2d 22 (2006), has "any effect" upon whether a lessee of an oil and/or gas lease subject to West Virginia Code § 22-6-8 (1994) may deduct post-production expenses from the lessor's royalty. Upon original hearing, a majority of this Court reformulated the certified question and held that royalties paid pursuant to leases which were subject to West Virginia Code § 22-6-8 could not be "diluted" by costs incurred downstream from the wellhead, nor could amounts attributable to loss or beneficial use of volume be deducted prior to calculation of royalties.

However, upon careful review of the briefs on rehearing, the appendix record, the arguments of the parties and amici curiae,[1] and the applicable legal authority, we conclude that both the legislative intent and language utilized in West Virginia Code § 22-6-8 permits allocation or deduction of reasonable post-production expenses actually

---

[1] The West Virginia Land and Mineral Owners' Association, West Virginia Royalty Owners' Association, West Virginia Farm Bureau, National Association of Royalty Owners, Appalachia, Lewis Maxwell Oil & Gas LLC, and Bounty Minerals, LLC. provided amici briefs in support of the petitioners' position. The West Virginia Oil and Natural Gas Association and West Virginia Independent Oil and Gas Association provided amici briefs in support of EQT's position. The Court acknowledges and expresses its appreciation for their submissions.

1

incurred by the lessee and more specifically permits use of the "net-back" or "work-back" method of royalty calculation.

## I. FACTS AND PROCEDURAL HISTORY

The petitioners Patrick D. Leggett, et al (hereinafter "the petitioners") are owners of a 75% undivided interest in the gas estate of a 2,000-acre tract in Doddridge County. Certain wells on the property are "flat-rate" wells, *i.e.* wells for which the lease provides for payment of a sum certain per well, per year. In 1982, the Legislature enacted the predecessor of West Virginia Code § 22-6-8,[2] which provides that permits for flat-rate wells will not be issued unless the lessee swears by affidavit that it will pay the lessor no less than one-eighth "of the total amount paid to or received by or allowed to [the lessee] *at the wellhead* for the oil or gas so extracted, produced or marketed[.]" (emphasis added).

The petitioners filed suit against respondent EQT Production Company and affiliated companies (hereinafter "EQT")[3] for underpayment of royalties, resulting from

---

[2] The statute was originally codified at West Virginia Code § 22-4-1 (1982) and subsequently recodified at West Virginia Code § 22B-1-8 (1985) before ultimately being recodified a final time at West Virginia Code § 22-6-8 (1994).

[3] Also named were EQT Energy, EQT Investment Holdings, EQT Gathering, and EQT Midstream Partners. EQT explains that EQT Production is the exploration and development company which "acquires the leases, drills the wells, and produces the gas, and bears all of the costs of doing so." EQT Gathering is the "midstream company," which "constructs and operates the gathering lines and compressors necessary to move the gas from the wells to the interstate pipeline." Finally, EQT Energy is the "sales company," which buys the gas from EQT Production and sells it to third parties. All of the claims

EQT's deduction of certain costs incurred for the gathering and transporting of the gas to the interstate pipeline. In particular, EQT takes the full price it obtains by selling the gas at the interstate pipeline and deducts "some" of the costs ("midstream" costs or "post-production" costs) incurred after it is extracted,[4] but before it reaches the market at the pipeline. EQT maintains that the only way to capture the statutorily-required "wellhead" price is to utilize this so-called "net-back" or "work-back" method which deducts post-production expenses from the sales price to duplicate the "wellhead" price. The petitioners contend that neither West Virginia Code § 22-6-8(e) nor the common law of West Virginia permit deduction or allocation of costs in this manner for purposes of royalty calculation.

Accordingly, the District Court certified the following questions to this Court pursuant to the Uniform Certification of Questions of Law Act, West Virginia Code § 51-1A-1 (1996) *et seq.*:

> 1. Does *Tawney v. Columbia Natural Resources, L.L.C.*, 219 W. Va. 266, 633 S.E.2d 22 (2006), which was decided after the enactment of West Virginia Code § 22-6-8, have any effect upon the Court's decision as to whether a lessee of a flat-rate lease, converted pursuant to West Virginia Code § 22-6-8,

---

against these defendants were dismissed in the action before the District Court, leaving only EQT Production Company as the named defendant.

[4] EQT asserts that it only deducts "some," not *all* of its midstream costs. In particular, it states that it does not make deductions for depreciation, income taxes, or return (*i.e*. profit). The petitioners, however, dispute this and further assert that these costs are payable to sister companies of EQT which makes the costs susceptible to overinflation. The petitioners further allege that nominal sales are made to sister companies for the purpose of reducing the petitioners' royalties.

3

may deduct post-production expenses from his lessor's royalty, particularly with respect to the language of "1/8 at the wellhead" found in West Virginia Code § 22-6-8(e)?

2.     Does West Virginia Code § 22-6-8 prohibit flat-rate royalties only for wells drilled or reworked after the statute's enactment and modify only royalties paid on a per-well basis where permits for new wells or to modify existing wells are sought, or do the provisions of West Virginia Code § 22-6-8 abrogate flat-rate leases in their entirety?[5]

(footnote added).

## II. STANDARD OF REVIEW

This Court has consistently held that "'[a] *de novo* standard is applied by this court in addressing the legal issues presented by certified question from a federal district or appellate court.' Syl. Pt. 1, *Light v. Allstate Ins. Co.*, 203 W. Va. 27, 506 S.E.2d 64 (1998)." Syl. Pt. 2, *Aikens v. Debow*, 208 W. Va. 486, 541 S.E.2d 576 (2000).  Moreover, "[w]here the issue on an appeal . . . is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."  Syl. Pt. 1, *Chrystal R.M. v. Charlie*

---

[5]Like the previous majority, this Court declines to answer the second certified question.  The previous majority found that it could "discern no claim with respect to the older wells that were drilled prior to the statute's enactment," finding it therefore irrelevant whether West Virginia Code § 22-6-8 abrogated flat-rate leases, as queried in the second certified question.  Critically, neither EQT nor the petitioners sought rehearing on the previous majority's conclusion that the second certified question was not dispositive and therefore neither party fully briefed the issue on rehearing.  Accordingly, we again decline to answer the second certified question. *See State ex rel. Advance Stores Co., Inc. v. Recht*, 230 W. Va. 464, 468-69, 740 S.E.2d 59, 63-64 (2013) ("[T]his Court will not address a certified question if it is not dispositive of a controlling issue in the case.").

4

*A.L.,* 194 W. Va. 138, 459 S.E.2d 415 (1995). With this standard of review in mind, we proceed to the remaining certified question.

## III. DISCUSSION

Upon review of EQT's petition for rehearing, this Court determined that substantial justice required us to revisit the prior opinion issued in this matter to ascertain whether the previous majority had misapprehended certain points of law. *See* W. Va. R. App. Proc. 25(b) ("A petition for rehearing is granted only in exceptional cases. The petition shall . . . state with particularity the point of law or fact which in the opinion of the petitioner the Court has overlooked or misapprehended[.]"). While an admittedly uncommon occurrence, rehearing exists expressly for the purpose of ensuring that opinions which are not well-founded due to misapprehension of the issues, the law, or the facts are rectified. Justice demands this procedural remedy, which this Court has judiciously utilized when the issues or outcome demand it. *See Knotts v. Grafton City Hosp.,* 237 W. Va. 169, 786 S.E.2d 188 (2016) (reversing and remanding upon rehearing after original affirm); *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 234 W. Va. 492, 498, 766 S.E.2d 751, 757 (2014) (stating that "public policy concerns raised by our initial opinion" compelled rehearing); *Hosaflook v. Consolidation Coal Co*., 201 W. Va. 325, 329, 497 S.E.2d 174, 178 (1997) (twice granting rehearing in Human Rights Act case); *Haines v. Kimble*, 221 W. Va. 266, 654 S.E.2d 588 (2007) (rehearing granted); *Committee on Legal Ethics of West Virginia State Bar v. Farber*, 191 W. Va. 667, 447 S.E.2d 602 (1994) (same); *Jewell v. Maynard,* 181 W. Va. 571, 383 S.E.2d 536 (1989) (same); *Dadisman v.*

5

*Moore*, 181 W. Va. 779, 384 S.E.2d 816 (1988) (same); *Turner v. State Compensation Comm'r*, 147 W. Va. 145, 126 S.E.2d 379 (1962) (same); *Garges v. State Compensation Comm'r,* 147 W. Va. 188, 126 S.E.2d 193 (1962) (same); *Ellis v. Henderson,* 142 W. Va. 824, 98 S.E.2d 719 (1957) (same); *Reese v. Lowry,* 140 W. Va. 772, 86 S.E.2d 381 (1955) (same); *Bailey v. Baker,* 137 W. Va. 85, 70 S.E.2d 645 (1952) (same); *State v. Gilliland,* 51 W. Va. 278, 41 S.E. 141 (1902) (same).

As this Court has observed, reconsideration upon rehearing is often facilitated by a more focused and clearer presentation of the arguments by the parties, who commonly have a better understanding of the Court's characterization of the dispositive issues following an initial opinion. *See Caperton v. A.T. Massey Coal Co.*, 223 W. Va. 624, 667, 679 S.E.2d 223, 266 (2008), *rev'd and remanded*, 556 U.S. 868 (2009) (Albright, J., dissenting) (noting that "[t]he more narrow and focused legal arguments and supporting facts of the rehearing process" aided in determination); *A. B.*, 234 W. Va. at 498, 518-19, 766 S.E.2d at 757, 777-78 (stating that briefs submitted seeking rehearing compelled Court to grant rehearing and criticizing respondent for attempting to supplement inadequate record on rehearing to meet issues discussed in initial opinion); *Haines*, 221 W. Va. at 272-73, nn.3 and 5, 654 S.E.2d at 594-95, nn.3 and 5 (discussing additional arguments and attempts to supplement the appendix to meet issues raised in initial opinion). Oftentimes, briefs upon rehearing pierce through any insufficiency or imprecision of argument which may have affected the Court's initial offering. This is particularly the case where a matter is before the Court on the necessarily limited record often submitted upon certified

6

question. When a petition for rehearing compels the Court to conclude that the law may have been misapprehended, neither hubris nor sanctimony should give the Court pause in granting rehearing to correct any such error of law or fact. As Justice Frankfurter stated, "[w]isdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters Nat'l Bank & Trust Co*., 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting).

As pertains to the question presented in this case, upon initial hearing, the majority concluded that West Virginia Code § 22-6-8(e) contains an ambiguity which must be construed in a manner which effectuates the "overarching remedial intent" of the statute to "ensur[e] the future flow of adequate compensation to oil and gas landowners." Such construction, according to the previous majority, must not "curtail [] compensation" which was intended to "right past wrongs" and therefore prohibits dilution of royalty payments by post-production costs. Coupled with the common law implied covenant to market previously recognized with respect to oil and gas leases, the majority concluded that royalties must remain "supremely constant," impervious to "facile downward manipulation" by the lessee and therefore post-production costs for "gathering, transporting, or treating" may not be deducted.[6]

---

[6] The prior opinion reformulated the certified question to reach this holding and further held that royalties paid pursuant to West Virginia Code § 22-6-8(e) may likewise not be reduced for volume deductions. "Volume deductions" refer to that volume of gas which is either lost or used in transport before it gets to market. The District Court's certified questions do not make inquiry, expressly or implicitly, regarding the propriety of

7

Upon rehearing, with all due regard to the previous majority's consideration of the admittedly complex and subversively entangled issues implicated in this case, we conclude that it did, in fact, misapprehend the applicability of certain common law principles and exceeded its charge in its interpretation of the subject statute.

### A.    *W. Va. Code § 22-6-8 and Valuation of Royalties Prior to Deregulation*

As initially outlined above, the petitioners contend that post-production costs incurred by an oil or gas lessee may not be allocated to the lessor in calculation of the lessor's royalty. The petitioners maintain that West Virginia Code § 22-6-8(e)'s provision that the lessor must be paid "one-eighth of the total amount paid to or received by or allowed to the owner of the working interest at the wellhead" is ambiguous with respect to payment of such costs; therefore, the statute should be construed in a manner which maximizes its remedial purpose. To maximize its remedial purpose, the petitioners contend that the phrase "at the wellhead" should be construed to prohibit allocation of post-production costs to lessors. The petitioners further urge that this construction is consistent with West Virginia's common law purportedly aligning itself with several "marketable

---

deductions for volume losses; accordingly, the majority's prior opinion was, at a minimum, improvidently overbroad.

8

product rule" states which require the lessee to bear all post-production costs incurred until the product is marketable.[7]

EQT maintains that the statute is not ambiguous since "at the wellhead" is a very precise and definite location. However, acknowledging that federal deregulation of the industry has altered the point of sale away from the wellhead, EQT argues that the only way to mathematically calculate the "at the wellhead" price for which it is obligated by statute is to utilize the "net-back" or "work-back" method. This method, as employed by EQT, utilizes the interstate pipeline sales price and makes deductions for post-production costs;[8] the resulting figure is that upon which the royalty is paid and therefore purports to

---

[7] West Virginia, however, has muddied the point to which costs must be borne by the lessee by making reference to the "point of sale" in its syllabus points, which may of course vary from the point in time in which a product becomes "marketable." Such inexplicable variations from the traditional rule have created widespread disillusionment with West Virginia's iteration of this rule as discussed more fully *infra*.

[8] Throughout the briefing of the parties, amici curiae, and caselaw, this "cost-bearing" is interchangeably referred to as "allocation" or "deduction" of costs from the royalty; in other instances the "net-back" or "work-back" method of royalty calculation is referenced. We concur with the following observation with regard to these various characterizations of the issue:

> Although the issue is commonly referred to as a "deduction of costs" issue, it is more accurately a "work-back" issue to adjust a downstream price to reflect an upstream value by subtracting (deducting) from the downstream price what it cost to put the wellhead gas in the position to fetch the downstream price.

David E. Pierce, *Royalty Jurisprudence: A Tale of Two States,* 49 Washburn L.J. 347, 377 n.91 (2010). Similarly, "the 'net-back' method does not 'charge' the lessor with any expenses at all, but instead is simply a method of determining what the wellhead value of

"duplicate" a wellhead price. Commensurately, EQT urges the Court to join those states which have formally adopted the "at the well" rule regarding cost allocation, which permits pro rata allocation and/or deduction of post-production expenses as between the lessee and lessor. With this understanding of the parties' positions, we proceed to examine the statute and applicable caselaw.

To place the parties' arguments into proper context, it is first critical to understand the purpose and operation of West Virginia Code § 22-6-8 and the change in the marketplace for oil and gas sales resulting from what is commonly referred to within the industry simply as "deregulation." West Virginia Code § 22-6-8 was originally enacted in 1982 to prohibit lessees from continuing to capitalize on older, "flat-rate" leases. The statute explains that these leases were entered into

> when the techniques by which oil and gas are currently
> extracted, produced or marketed, were not known or
> contemplated by the parties, nor was it contemplated by the
> parties that oil and gas would be recovered or extracted or
> produced or marketed from the depths and horizons currently
> being developed by the well operators.

---

the gas would have been if there had been a market for the gas at the wellhead." Brian S. Wheeler, *Deducting Post-Production Costs When Calculating Royalty: What Does the Lease Provide?,* 8 Appalachian J.L. 1, 29 (2008). For ease of reading, we likewise somewhat interchangeably utilize the terms "allocation" and "deduction" of costs throughout this opinion. However, whether referred to as cost "allocation," "deduction," or use of the "net-back" method, our opinion should be read as encompassing any manner by which the lessee make allowances for its cost expenditures in calculating the lessor's royalty.

10

W. Va. Code § 22-6-8(a)(3). The Legislature then declared that the statute was enacted because

> continued exploitation of the natural resources of this state in exchange for such wholly inadequate compensation is unfair, oppressive, works an unjust hardship on the owners of the oil and gas in place, and unreasonably deprives the economy of the State of West Virginia of the just benefit of the natural wealth of this State[.]

W. Va. Code § 22-6-8(a)(2). Recognizing, apparently, that invalidating such leases altogether may run afoul of the Constitution, [9] the Legislature set out to lawfully "discourage . . . the production and marketing of oil and gas" under such leases. W. Va. Code § 22-6-8(a)(4). Accordingly, to avoid unconstitutionally impairing the contractual obligation, the statute simply prohibits the *issuance of permits* under such leases. Subsection (d) therefore provides:

> [N]o such permit shall be hereafter issued for the drilling of a new oil or gas well, or for the redrilling . . . of an existing oil or gas production well, where or if the right to extract, produce or market the oil or gas is based upon a lease or leases or other continuing contract or contracts providing for flat well royalty[.]

W. Va. Code 22-6-8(d). To avoid this prohibition, a permit applicant must file an affidavit certifying that it will

---

[9] The statute expressly states that the Legislature is "fully cognizant [of] the provisions of section 10, article I of the United States Constitution and of section 4, article III of the Constitution of West Virginia, proscrib[ing] the enactment of any law impairing the obligation of a contract[.]" W. Va. Code § 22-6-8(a)(4); *see* U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts . . ."); W. Va. Const. art. III, § 4 ("No bill of attainder, ex post facto law, or law impairing the obligation of a contract, shall be passed." ).

11

tender to the owner of the oil or gas in place not less than one eighth of the total amount paid to or received by or allowed to the owner of the working interest *at the wellhead* for the oil or gas so extracted, produced or marketed before deducting the amount to be paid to or set aside for the owner of the oil or gas in place, on all such oil or gas to be extracted, produced or marketed from the well.

W. Va. Code § 22-6-8(e) (emphasis added). In short, to get a permit to re-drill wells governed by a flat-rate lease, the lessee must agree to pay the lessor a one-eighth royalty instead of a flat rate.

The parties are in agreement that when West Virginia Code § 22-6-8 was enacted, oil and gas sales occurred "at the wellhead," *i.e.* at the point where the product first emerges from the ground or literally, the head of the well. Interstate pipeline operators purchased the product and undertook the expense of preparing the oil or gas for sale at market in a useable or "marketable" form. In 1978, Congress began to "deregulate" the natural gas market, which turned interstate pipeline operators into common carriers.[10] As

---

[10] As succinctly explained by the Colorado Appellate Court:

Congress took a first step toward increasing competition in the natural gas market by enacting the Natural Gas Policy Act of 1978, 15 U.S.C. § 3301, et seq., which was designed to phase out regulation of wellhead prices charged by producers of natural gas, and to promote gas transportation by interstate and intrastate pipelines for third parties. Pipelines were reluctant to provide common carriage, however, when doing so would displace their own sales.

Thus, in 1985, the Federal Energy Regulatory Commission (FERC) promulgated Order No. 436, which contained an

a result, oil and gas are no longer sold "at the wellhead," but rather are sold downstream of the wellhead, typically at the interstate pipeline. Importantly, one of the effects of this change is that the sales price is enhanced from the wellhead price because it is now a marketable, useable product when it is first sold at market, rather than the raw, "sour" gas which was sold from the wellhead.[11] However, as a result, expenses to "clean" or

"open access" rule providing incentives for pipelines to offer gas transportation services.

In 1992, this evolution culminated in FERC's Order No. 636, which required all interstate pipelines to "unbundle" transportation services from their own natural gas sales and to provide common carriage services to buyers from other sources that wished to ship gas. This implementing regulation dramatically changed the natural gas industry, because pipeline companies were "no longer permitted . . . to act as traditional merchants—buying gas at the wellhead and reselling the gas downstream—producers had to now market the gas themselves."

The deregulation of the natural gas industry is considered the major catalyst for the current wave of royalty litigation because, before deregulation, buyers purchased gas at or near the wellhead, thereby absorbing most post-wellhead costs. Now, most gas is purchased away from the wellhead.

*Clough v. Williams Prod. RMT Co*., 179 P.3d 32, 35 (Colo. Ct. App. 2007) (citations omitted).

[11] "To make the sour gas into sweet gas, which is a usable marketable product, [impurities] are extracted from the sour gas." *Bice v. Petro-Hunt, L.L.C*., 768 N.W.2d 496, 500 (N. D. 2009). As the court further explained in *Garman v. Conoco, Inc.,* 886 P.2d 652, 653-54 (Colo. 1994), with respect to costs potentially incurred in the post-production phase, as a result of the marketplace moving away from the wellhead:

Gas may require processing to remove impurities for marketing, and once marketable may be further processed into

"sweeten" the gas, gather and/or compress the gas, and transport the gas are incurred after it is extracted but before it is sold, *i.e.* "post-production" costs. This case presents the issue of whether the lessee must bear all such post-production expenses or whether it may pro-rata allocate them to the lessor and deduct them from the royalty paid by operation of West Virginia Code § 22-6-8(e). The parties' briefing indicates that they believe that implicit within that query is whether this Court will apply its previously-articulated common-law version of the "marketable product rule" or adopt the "at the well" rule of cost allocation.

**B.** ***Wellman v. Energy Resources, Inc*. and *Tawney v. Columbia Natural Resources***

To determine the applicability of either of these schools of thought to the statute at issue, it is necessary to examine West Virginia's common law as pertains to allocation of costs in an oil and gas lease. As noted above, the District Court phrased the certified question in terms of whether *Tawney v. Columbia Natural Resources* has "any effect" upon the determination of whether use of the phrase "at the wellhead" in West

---

additional component products. Transportation is required when gas is moved from the wellhead to a central location to prepare it for transmission and consumption, commonly referred to as gathering. If no market for the gas exists near the wellhead, transportation may be required to move the gas to a distant market. Compression may be required to create sufficient pressure for the gas to enter a purchaser's pipeline, or compression may occur to transform the gas into additional products.

(citations omitted). *See also Rogers v. Westerman Farm Co*., 29 P.3d 887 (Colo. 2001) *as modified on denial of reh'g* (Aug. 27, 2001) (discussing necessity of dehydration and compression of "raw gas" and specifications of interstate pipeline).

14

Virginia Code § 22-6-8 permits allocation and deduction of post-production costs before calculation of royalties. The petitioners urge that both *Tawney* and its predecessor, *Wellman v. Energy Resources, Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001), firmly establish West Virginia as a "marketable product" rule state, which rule provides that the implied duty to market requires the lessee to bear all costs until the product is rendered "marketable." EQT, however, maintains that both *Wellman* and *Tawney* are inapplicable to the statute at issue and urge an interpretation which mirrors the "at the well" rule, permitting use of the "net-back" method to calculate royalties "at the wellhead." We will examine each case in turn.

Despite the District Court and parties' pre-emptive focus on *Tawney*, it is *Wellman* which forms the foundation of the current state of West Virginia's law on deduction of post-production costs. In *Wellman*, the Court addressed an action brought by the lessors seeking termination of certain oil and gas leases and damages for failure to pay proper royalties. *Id.* at 204, 557 S.E.2d at 258. The leases provided for natural gas royalties of "'one-eighth (1/8) of the market value of such gas at the mouth of the well[.]'" *Id.* The lessee deducted "certain expenses" before calculating royalties. *Id.* at 209, 557 S.E.2d at 263. In resolving the question of whether such expenses were properly deductible, the Court noted the widely adopted position that "costs of discovery and production" are not chargeable against a royalty. *Id.* at 210, 557 S.E.2d at 264. The Court then stated that "[i]n spite" of this position, oil and gas producers had begun deducting costs for transporting

15

and "treating or altering" the oil and gas after it is "produced" to put it into marketable condition. *Id.*

The *Wellman* Court briefly acknowledged the split of authority regarding deduction of such post-production costs and discussed the rationale of those states holding that such costs are not properly deductible from the lessor's royalty. *Id.* at 210, 557 S.E.2d at 264. The Court noted that pursuant to the implied covenant to market,[12] such "duty to market embraces the responsibility to get the oil or gas in marketable condition and actually transport it to market." *Id.* Noting simply that like other marketable product rule states, "West Virginia holds that a lessee impliedly covenants that he will market oil or gas produced[,]" the Court quickly concluded that "unless the lease provides otherwise, the lessee must bear all costs incurred in exploring or, producing, marketing, and transporting the product to the point of sale." *Id.* at 211, 557 S.E.2d at 265, Syl. Pt. 4.[13] The Court then

---

[12] "Implied covenants are unwritten promises by one of the parties to a contract." John S. Lowe, *Interpreting The Royalty Obligation: The Role Of The Implied Covenant To Market*, 2003-1 RMMLF-INST 6 (2003). "The [implied covenant to market] requires that the lessee exercise reasonable diligence to market the products, defined as 'whatever, in the circumstances, would be reasonably expected of all operators of ordinary prudence, having regard to the interests of both lessor and lessee.'" *Rogers,* 29 P.3d at 903 (citing *Davis v. Cramer*, 808 P.2d 358, 361 (Colo. 1991)). Courts and commentators alike disagree about the scope of the implied duty and its application. *See* n.15, *infra*.

[13] Notably, the Court never utilized the term "marketable product" in *Wellman* or *Tawney*, for that matter. In fact, aside from its basic premise, the holding articulated in *Wellman* bears little resemblance to the fully-formed marketable product rules adopted by other such states. Rather than the "point of sale" referenced in *Wellman*, other courts adopting the "marketable product rule" have held that costs need not be shared until a "marketable" product is obtained:

> Absent express lease provisions addressing allocation of costs, the lessee's duty to market requires that the lessee bear the expenses incurred in obtaining a marketable product. Thus, the expense of getting the product to a marketable condition and location are borne by the lessee. *Once a product is marketable, however, additional costs incurred to either improve the product, or transport the product, are to be shared proportionately by the lessor and lessee. All costs must be reasonable*.

*Rogers*, 29 P.3d at 906 (emphasis added). Additionally, the *Rogers* court explained that

> [g]as is marketable when it is in the physical condition such that it is acceptable to be bought and sold in a commercial marketplace, and in the location of a commercial marketplace, such that it is commercially saleable in the oil and gas marketplace. The determination of whether gas is marketable is a question of fact, to be resolved by a fact finder.

*Id.* at 906. Further illustrating the factual complexities which are implicated in determining whether expenses are deductible in a "marketable product" state, the Kansas Supreme Court held in a case where gas *was* sold at the wellhead that "the duty to make gas marketable is satisfied when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction." *Fawcett v. Oil Producers, Inc. of Kansas*, 352 P.3d 1032, 1042 (Kan. 2015). *See also Mittelstaedt v. Santa Fe Minerals, Inc.*, 954 P.2d 1203, 1208 (Okla. 1998) ("When the gas is shown by the lessee to be in a marketable form at the well the royalty owner may be charged a proportionate expense of transporting that gas to the point of purchase. The lessee bears the burden of showing that such cost is reasonable, and that actual royalty revenues increased in proportion with the costs assessed against the nonworking interest." (citations omitted)).

Moreover, the term "post-production costs" encompasses a myriad of expenses potentially incurred in the process. For instance, in *Garman*, the court found only that those post-production costs incurred to create a marketable product were exclusively borne by the lessee, but that any costs which "enhance[d] the value of an already marketable product" were assessable to the lessor. 886 P.2d at 661. *Cf. Sternberger v. Marathon Oil Co.*, 894 P.2d 788 (1995) (recognizing operator's general duty to prepare gas for market and distinguishing transportation costs from compression costs required to make gas marketable). *See* n.11, *supra* regarding variety of potential costs involved in natural gas processing. As an additional consideration, "natural gas must meet certain quality

went a step further, holding that where the lease provides for apportionment of any such costs, they must be "actually incurred" and "reasonable." Syl. Pt. 5, *Wellman,* 210 W. Va. 200, 557 S.E.2d 254.

With *Wellman* as background, we therefore turn to the *Tawney* decision to ascertain the scope and import of its holdings. *Tawney* answered a certified question tantalizingly similar to the instant certified question which inquired whether an oil and gas lessee must "bear all costs incurred in marketing and transporting" the product where the lease states that royalties are to be calculated "at the well," or "at the wellhead[.]" 219 W. Va. at 268, 633 S.E.2d at 24. Respondent Columbia Natural Resources ("CNR") sought to take monetary deductions for post-production costs as well as volume deductions[14] before calculating the landowners' royalty on the involved leases. *Id.* at 269, 633 S.E.2d at 25. As in this case, CNR argued that since gas is not sold at the wellhead, "the only logical way to calculate royalties at the wellhead is to permit lessees to deduct the lessors'

specifications before it can enter an interstate gas pipeline and it must be processed to achieve those specifications." *Fawcett*, 352 P.3d at 1035.

As is clear from their holdings, these cases developed guiding principles regarding not only the "point of sale" (*i.e.* is there a point of sale available other than where the oil/gas was actually sold and did the costs increase the revenue proportionately?) and "marketability" (*i.e.* was the gas in its natural state at the wellhead capable of being sold and when was a "marketable" product achieved?), but also the type of costs (*i.e.* costs for dehydrating and compressing, as compared to gathering and transporting) which were incurred quite thoroughly. Neither *Wellman* nor *Tawney* dignify these issues, much less develop them, despite the fact that such considerations give substance and equity to the rule.

[14] *See* n.6, *supra* regarding volume deductions.

18

proportionate share of post-production expenses[.]" *Id.* at 270, 633 S.E.2d at 26. The *Tawney* Court accepted, without further analysis, *Wellman*'s reliance on the implied duty to market and resultant holding that a lessee must "bear all costs incurred in exploring for producing, marketing, and transporting the product to the point of sale[.]" *Id.* at 272, 633 S.E.2d at 28 (quoting Syl. Pt. 4, *Wellman*, 210 W. Va. 200, 557 S.E.2d 254). The Court then narrowed the issue to whether the leases' "at the wellhead" language was sufficient to alter this "generally recognized rule." *Tawney*, 219 W. Va. at 272, 633 S.E.2d at 28.

The *Tawney* Court found the "at the wellhead" language ambiguous because it was "imprecise" and did not "indicate *how* or *by what method* the royalty is to be calculated or the gas is to be valued." *Id.* at 272, 633 S.E.2d at 28 (emphasis in original). Having found such language ambiguous, the Court noted the absence of language evidencing "an intent by the parties to agree to a contrary rule" and stated that if CNR desired to pro-rate expenses with the landowners, it "could have written into the leases specific language which clearly informed the lessors exactly how their royalties were to be calculated and what deductions were to be taken from the royalty amounts for post-production expenses." *Id.* at 272, 274, 633 S.E.2d at 28, 30. Citing the "'general rule as to oil and gas leases . . . that such contracts will generally be liberally construed in favor of the lessor, and strictly as against the lessee,'" the Court then construed the lease against CNR and held that the "at the wellhead" language was insufficient to allow deduction of post-production expenses. *Id.* at 273, 633 S.E.2d at 29 (quoting Syl. Pt. 1, *Martin v. Consolidated Coal & Oil Corp.,* 101 W. Va. 721, 133 S.E. 626 (1926)). Resting entirely

19

on the premise that CNR could simply have negotiated for and/or included in their leases language regarding cost allocation, the Court issued the following syllabus point setting forth the criteria for expressing such an intention in an oil and gas lease:

> Language in an oil and gas lease that is intended to allocate between the lessor and lessee the costs of marketing the product and transporting it to the point of sale must expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, identify with particularity the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), and indicate the method of calculating the amount to be deducted from the royalty for such post-production costs.

Syl. Pt. 10, *Tawney*, 219 W. Va. 266, 633 S.E.2d 22.

## C. Applicability of <u>*Tawney*</u> to West Virginia Code § 22-6-8(e)

Having examined *Tawney*, we turn now to the District Court's first certified question. At first blush, it would appear that the District Court's first certified question is unnecessarily restrictive to reach the issue of whether post-production costs may be properly allocated under the language of West Virginia Code § 22-6-8(e), in that it asks merely whether *Tawney* has "any effect" on this determination. Upon further consideration, however, the District Court's question demonstrates an awareness of and subtly highlights the problematic nature of blind application of *Tawney's* deceptively "on-point" holding. As noted above, both *Wellman* and *Tawney* involved the leasing parties' use of the term "at the wellhead" in their freely-negotiated leases. Accordingly, those Courts were free to utilize common law principles pertaining to oil and gas leases and contracts generally—the implied covenant to market and construction of a contract against

20

the drafter, respectively—to interpret the lease and resolve the issue. Utilizing these common law principles to interpret a statute, however, is not legally sound. *See Kilmer v. Elexco Land Servs, Inc*., 990 A.2d 1147, 1155 (Pa. 2010) (recognizing states adopting marketable product rule "have done so as a matter of common law in interpreting ambiguities in leases, not through statutory interpretation of a preexisting statute.").

First, as a paramount matter, the rules of statutory construction are considerably different than the rules of contract interpretation.

> The legal standards applicable to issues of statutory interpretation have evolved separately from those involving matters of contract interpretation. Thus, despite the fact that . . . statutory and contractual language are essentially identical, it is theoretically possible that the application of each set of legal standards would yield divergent results . . . . For example, the legislature may have intended the statutory language to have a different meaning than the one contemplated by the contracting parties, even though the contract's drafters may have merely parroted the language of the existing statute.

*Major Oldsmobile, Inc. v. Gen. Motors Corp*., No. 93-Civ-2189 (SWK), 1995 WL 326475, at *4 (S.D.N.Y. May 31, 1995), *aff'd*, 101 F.3d 684 (2d Cir. 1996); *see Ford Motor Co. v. Meredith Motor Co*., No. CIV. 99-456-B, 2000 WL 1513702, at *5 (D.N.H. Aug. 24, 2000), *overruled on other grounds as recognized in Colonial Imports Corp. v. Volvo Cars of N. Am., Inc*., No. CIV. 98-342-B, 2001 WL 274808, at *1 (D.N.H. Jan. 9, 2001) ("Statutory interpretation differs from the interpretation of contract language."). Obviously, a statute cannot be "construed against" a party. On a more fundamental level, however, the flaw in applying caselaw involving freely negotiated leases to interpret the

21

statutory language at issue is that the parties bound by the statute had no hand in its terms or negotiation. The language choice—"at the wellhead"—was that of the Legislature. West Virginia and other courts applying the marketable product rule to prohibit post-production cost allocation, justify its imposition by recognizing that parties entering into a lease may expressly provide for the allocation of costs in an effort to evade the imposition of a common law rule. *See* Syl. Pt. 4, in part, *Wellman,* 210 W. Va. 200, 557 S.E.2d 254 (". . . *[U]nless the lease provides otherwise*, the lessee must bear all costs incurred in exploring for producing, marketing, and transporting the product to the point of sale." (emphasis added)); Syl. Pt. 10, in part, *Tawney,* 219 W. Va. 266, 633 S.E.2d 22 ("Language in an oil and gas lease that is intended to allocate between the lessor and lessee the costs of marketing the product and transporting it to the point of sale *must expressly provide* that the lessor shall bear some part of the costs incurred . . ." (emphasis added)); *Wood v. TXO Production Corp.*, 854 P.2d 880, 883 (Okla. 1992) ("If a lessee wants royalty owners to share in compression costs, that can be spelled-out in the oil and gas lease. Then, a royalty owner can make an informed economic decision . . ."). A lessee subject to West Virginia Code § 22-6-8 obviously has no opportunity to "expressly provide" otherwise.

Moreover, other courts have recognized that, in addition to making express provisions for costs, freely negotiating parties to a lease may limit the implied covenants which may append to such leases. *See Garman*, 886 P.2d at 664 ("The parties to an oil and gas lease, may, by express agreement in the lease, limit the covenants implied in the lease.") (Erickson, J., concurring). Like express provisions for cost allocations, a lessee subject to

22

West Virginia Code § 22-6-8 has no opportunity or ability to expressly disclaim any such implied covenants. Further, the implied covenant to market does not append itself to statutes; rather, it is a tool utilized to resolve contractual ambiguities. Implied covenants have been frequently referred to as contractual "gap-fillers" utilized to implement the parties intentions where not otherwise stated: "Implied covenants, as the authorities say, are only justified on grounds of legal necessity, and to effectuate the purposes of the contract." *Allen v. Colonial Oil Co.*, 92 W. Va. 689, 115 S.E. 842, 844 (1923).[15]

---

[15] Furthermore, the use of the implied covenant to market to reach the issue of cost allocation is highly questionable. While there is little question that it is uniformly recognized that a lessee has an implied duty to make a reasonable effort to market gas, several courts have concluded "that duty does not extend beyond 'sell[ing] the gas at a reasonable price at the well side.'" *Baker v. Magnum Hunter Prod., Inc.*, 473 S.W.3d 588, 595 (Ky. 2015) (quoting *Rains v. Kentucky*, 255 S.W.121, 125 (Ky. 1923)); *see also Heritage Resources, Inc., v. NationsBank*, 939 S.W.2d 118, 129 (Texas 1996) (Owen, J., concurring) (finding that implied duty to market cannot override express agreement evidenced by use of term "at the well"); Owen L. Anderson, *Royalty Valuation: Should Royalty Obligations Be Determined Intrinsically, Theoretically, or Realistically?* Part 2, 37 Nat. Resources J. 611, 693 n.89 (1997) ("[T]he implied covenant to market has grown like Topsy. Arguably, it should be confined to its original purpose: to require the lessee to diligently seek a market for gas reserves that are shut-in.").

Nevertheless, the petitioners argue that since the Legislature is presumed to be aware of all existing common law, it was aware of West Virginia's recognition of the implied covenant to market and therefore intended that the lessee bear all post-production costs. "[T]he Legislature is presumed to be aware of the common law underlying particular areas of legislation." *Thomas v. McDermitt,* 232 W. Va. 159, 165, 751 S.E.2d 264, 270 (2013). Arguably, the Legislature may certainly be presumed to have been aware of the implied covenant to market when the statute was enacted in 1982. However, it is wholly unreasonable to infer that it would or should be aware of the *Wellman* and *Tawney* Courts' subsequent broadening of the covenant as a tool to prohibit post-production cost allocation approximately twenty years later.

23

Accordingly, the implied covenant to market relied upon by the *Wellman* and *Tawney* Courts has no application as pertains to leases affected by West Virginia Code § 22-6-8.

In this instance, at the times these leases were executed, the parties contemplated neither the marketing of the product and any implied covenants thereof, nor cost allocation because the leases were flat-rate leases. The lessor's royalty issued irrespective of production, making post-production costs and the marketing efforts of the lessor irrelevant to both parties for purposes of the lease. Only by operation of West Virginia Code § 22-6-8(e), then, is cost allocation implicated in the parties' dealings. Accordingly, without the commensurate ability to bargain about allocation of costs or limit any implied covenants which may affect cost-bearing, utilizing cases which are premised on these considerations is of limited utility at best and inequitable at worst. Dogmatic imposition, therefore, of West Virginia's so-called marketable product rule— which was developed upon these considerations—to prohibit allocation of post-production expenses as requested by the petitioners yields little parity when the parties were not free to contract otherwise.

Moreover, use of this Court's cases involving freely negotiated contracts— which were decided years after the statute at issue was enacted—to foster a reading of the statute which affects the terms of a contract regarding matters which were not within the contemplation of the parties is potentially problematic on a constitutional level. This Court has stated that "those who enter into contracts do so with reference to the law as it exists at

24

the date thereof; and any impairment by legislative action, or otherwise, of an obligation thus created, is plainly inhibited by both the State and Federal Constitutions." *McClintic v. Dunbar Land Co.*, 127 W. Va. 454, 461, 33 S.E.2d 593, 596 (1945). While West Virginia Code § 22-6-8 itself is cognizant of the delicate balancing act it undertakes to avoid unconstitutionally impairing contractual rights by affecting only the issuance of permits, extending the statute beyond that procedural prerequisite into the terms of the negotiated lease between the parties is dangerous territory. *See* n.9, *supra*. In interpretation of a statute, it is not for this Court to attempt to "retrofit" this Court's caselaw to give meaning to a statute enacted well before such precedent, particularly when such precedent employs a rationale wholly inapplicable to statutory construction and so substantially affects the contracting parties' rights. We therefore conclude that neither *Wellman* nor *Tawney* are applicable to an analysis of the "at the wellhead" language contained in West Virginia Code § 22-6-8(e).

Before leaving our discussion of *Wellman* and *Tawney*, however, we are compelled to further illustrate the faulty legs upon which this precedent and its iteration of the marketable product rule purports to stand. Commentators have noted that *Wellman* failed to "recognize the variations in the first marketable product doctrine from state to state" and "whether intentionally (as a result of its apparent antagonism against oil and gas producers) or unintentionally (as a result of its cursory review of the case law) . . . adopted yet another version of the first marketable product doctrine[.]" Byron C. Keeling &

25

Karolyn King Gillespie, *The First Marketable Product Doctrine: Just What Is the "Product"?*, 37 St. Mary's L.J. 1, 77, 79 (2005). Moreover, *Wellman's*

> "point of sale" approach results in an even bigger windfall for lessors than the "marketable product" approach. Under the "point of sale" approach, a lessor will not only receive a royalty valued upon the gas in its natural state at the wellhead or when the gas becomes marketable, but will receive a royalty valued upon the gas in its processed state at the point of sale after the gas has had value added to it solely at the lessee's expense.

Wheeler, *supra* at 27-28. The *Wellman* and *Tawney* Courts' refusal to align with other states which have more fully developed this rule has, according to these commentators, created "chaos" and "foster[s] the belief—perhaps the reality—that the [marketable product] doctrine lacks any cornerstone principles[.]" Keeling & Gillespie, *supra* at 79, 80.

More importantly, still other commentators have observed that "West Virginia has actually achieved a Marketable Product Rule result that seems to arise more from an unwillingness to accept the realities of deregulation in the natural gas market than from implied covenant law." John W. Broomes, *Waste Not, Want Not: The Marketable Product Rule Violates Public Policy Against Waste of Natural Gas Resources*, 63 U. Kan. L. Rev. 149, 170–71 (2014). As support for this proposition, authors have cited to *Wellman's* and *Tawney's* dogged devotion to Professor Donley's, pre-deregulation 1951 treatise "The Law of Coal, Oil and Gas in West Virginia and Virginia." Additionally, citing *Tawney's* stinging criticism that the lessee in that case did not even begin deducting costs

26

until 1993, one author uses this statement to establish the *Tawney* Court's complete misunderstanding of the industry:

> The problem with this observation [that the lessee did not deduct costs until 1993] is that the lessee would not have incurred post-production costs prior to 1993 because the pipeline company would most likely have been purchasing gas at the wellhead for a price that reflected the gathering, dehydration, compression, treating, processing, line loss, and other investments associated with the gas as it moved from the wellhead to the point of sale.

Pierce, *supra* at 368.

In sum, this Court's jurisprudence on this issue has been critically described as follows:

> If one believes the language has a role to play in defining the lessee's rights and obligations under the oil and gas lease, then the artful approach[] of the . . . West Virginia court[] [is] nothing more than a re-writing of the parties' contract to take money from the lessee and give it to the lessor.

*Id.* at 374. The foregoing notwithstanding, however under-developed or inadequately reasoned this Court observes *Wellman* and *Tawney* to be, the issue presently before the Court simply does not permit intrusion into these issues. We therefore leave for another day the continued vitality and scope of *Wellman* and *Tawney.*

**D.  *Interpretation of "At the Wellhead" as used in West Virginia Code § 22-6-8(e)***

The foregoing leads us inexorably to the conclusion that West Virginia Code § 22-6-8(e) must therefore be applied and/or interpreted without regard to the policy-driven issues of whether West Virginia is or should be a "marketable product" state as contemplated in *Wellman* and *Tawney*, or should adopt the "at the well" rule. Just as we reject *Wellman* and its progeny as dispositive of the statutory issues presented herein, we must likewise reject the implicit entreaties of the parties and amici curia to make "good" policy choices in our interpretation of the language of West Virginia Code § 22-6-8(e). The touchstone of the issue presented by the District Court is strictly one of statutory interpretation and we are thus bound by our well-established and extensive canons in that regard. *Accord Kilmer,* 990 A.2d 1147 (rejecting adoption of competing rules of post-production cost deduction in favor of statutory interpretation).

### 1.    *Legislative Intent*

As this Court has long-recognized, "[t]he primary rule of statutory construction is to ascertain and give effect to the intention of the Legislature." Syl. Pt. 8, *Vest v. Cobb*, 138 W. Va. 660, 76 S.E.2d 885 (1953). "Judicial interpretation of a statute is warranted only if the statute is ambiguous and the initial step in such interpretative inquiry is to ascertain the legislative intent." Syl. Pt. 1, *Ohio County Comm'n v. Manchin*, 171 W. Va. 552, 301 S.E.2d 183 (1983). Moreover, "[i]t is important to note that, if the legislative intent is clearly expressed in the statute, this Court is not at liberty to construe the statutory provision, but is obligated to apply its plain language." *Dan's Carworld, LLC v. Serian*, 223 W. Va. 478, 484, 677 S.E.2d 914, 920 (2009). The foregoing compels us to

28

first carefully examine the Legislature's unusually extensive statement of purpose in the statute at issue and consider the circumstances at the time of enactment.

As set forth at length in West Virginia Code § 22-6-8, the West Virginia Legislature expressly sought to restore a "just" benefit to those upon whom a flat-rate lease worked an "*unfair*, *oppressive*, [and] *unjust* hardship" upon mineral owners and "*unreasonably* deprive[d]" the State's economy of such benefit. W. Va. Code 22-6-8(a)(2) (emphasis added). Critically, the statute expressly states that it seeks to bring an end to "*inadequate* compensation" for the State's natural resources. *Id.* (emphasis added). The Legislature could scarcely have used more descriptive terms to convey the over-arching goal of the statute: to ensure fair and adequate compensation for the State's mineral owners.

### 2. *Statutory Language*

With this intention as backdrop, we turn to the statute's plain language. In analyzing the meaning of a statute, "[w]e look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed." *Appalachian Power Co. v. State Tax Dep't*, 195 W.Va. 573, 587, 466 S.E.2d 424, 438 (1995); *see also* Syl. Pt. 2, *Crockett v. Andrews*, 153 W.Va. 714, 172 S.E.2d 384 (1970) ("Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation."); Syl. Pt. 5, *State v. General Daniel Morgan Post No. 548, V.F.W.*, 144 W. Va. 137, 107 S.E.2d 353 (1959)

29

("When a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute.").

The statute requires that the affidavit executed by the lessor, as a prerequisite to re-permitting, aver that the lessor will tender to the "owner of the oil or gas in place not less than one eighth of the total amount paid to or received by or allowed to the owner of the working interest at the wellhead for the oil or gas so extracted, produced or marketed[.]" W. Va. Code § 22-6-8(e). As the parties readily agree, however, the industry practice with respect to sale of oil or gas has changed considerably due to deregulation since the time the statute was enacted and sales no longer occur "at the wellhead." With respect to statutes which outlive circumstances existing at the time of enactment, this Court has held: "The basic and cardinal principle, governing the interpretation and application of a statute, is that the Court should ascertain the intent of the Legislature *at the time the statute was enacted*, and *in the light of the circumstances prevailing at the time of the enactment*." Syl. Pt. 1, *Pond Creek Pocahontas Co. v. Alexander*, 137 W. Va. 864, 74 S.E.2d 590 (1953) (emphasis added).

In consideration of the foregoing, we readily conclude that the phrase "at the wellhead" is not ambiguous as used in West Virginia Code § 22-6-8. Despite *Tawney's* conclusion to the contrary, we disagree fully with its rationale that "at the wellhead" is ambiguous simply because it fails to fully outline allocation of post-production costs.

30

Rather, the absence of such terms is mere silence and as this Court has repeatedly held, "silence does not, in and of itself, render a statute ambiguous." *Griffith v. Frontier W. Va., Inc.*, 228 W. Va. 277, 285, 719 S.E.2d 747, 755 (2011). Moreover, "at the wellhead" is not ambiguous on its face; indeed, even the parties agree that the phrase "at the wellhead" has a very precise and definite meaning.[16] *See also* 3 Patrick H. Martin and Bruce M. Kramer, *Williams & Meyers Oil and Gas Law* § 645.2 at 614.12(14) (2016) ("If anything, the term 'wellhead' is very precise and definite because it is a clearly recognizable place which even laypersons can understand."). Courts have likewise found the phrase easily definable and with precise meaning. *See Piney Woods Country Life Sch. v. Shell Oil Co.*, 726 F.2d 225, 240 (5th Cir. 1984) ("'At the well' means that the gas has not been increased in value by processing or transportation."); *Atl. Richfield Co. v. State of Cal.,* 262 Cal. Rptr. 683, 688 (Cal. Ct. App. 1989) ("The term 'at the well,' when used with reference to oil and gas royalty valuation, is commonly understood to mean that the oil and gas is to be valued in its unprocessed state as it comes to the surface at the mouth of the well."); *Bice*, 768 N.W.2d at 502 ("[T]he term market value at the well is not ambiguous."); *Heritage Resources,* 939 S.W.2d at 129 ("The words 'at the well' should be given their straightforward meaning. Market value 'at the well' means the value of the gas at the well,

---

[16] The petitioners brief states: "Petitioner can agree with Respondent that the 'wellhead' is easily identified." However, even if the parties were not in such agreement, "[t]he fact that parties disagree about the meaning of a statute does not itself create ambiguity or obscure meaning." *T. Weston, Inc. v. Mineral County*, 219 W. Va. 564, 568, 638 S.E.2d 167, 171 (2006) (citing *Deller v. Naymick*, 176 W. Va. 108, 112, 342 S.E.2d 73, 77 (1985)).

before it is transported, treated, compressed or otherwise prepared for market."); *Judice v. Mewbourne Oil Co.*, 939 S.W.2d 133, 136 (Tex. 1996) ("[V]alue at the well means the value of the gas before it has been compressed and before other value is added in preparing and transporting the gas to market."); *see also Cotiga Dev. Co. v. United Fuel Gas Co.,* 147 W. Va. 484, 128 S.E.2d 626 (1962) (distinguishing between wellhead price of gas from price received at market).

Not only is the "at the wellhead" language clearly indicative of a legislative intention to value the royalties paid pursuant to the statute based on the unprocessed wellhead price, we do not believe that permitting lessors to benefit from royalties based upon an enhanced, downstream price without commensurately sharing in the expense to create the enhanced value effectuates the "adequate" and "just" compensation sought by the statute. Nowhere within the stated purpose did the Legislature utilize language which enabled the "maximum benefit to landowners" construction adopted by the previous majority.[17] As the *Atlantic Richfield* court observed: "This is not a case where literal interpretation would result in absurdity, requiring adroit interpretation by a reviewing court

---

[17] This is where we believe the previous majority most clearly missed the mark. Caught up in the passionate and persuasive statement of legislative intent set forth in West Virginia Code § 22-6-8, the previous majority misconstrued the intent of the Legislature to permit an unjustifiable windfall that far exceeds the Legislative purpose of bringing an end to "*inadequate* compensation" for the State's natural resources. W. Va. Code § 22-6-8(a)(2) (emphasis added).

. . . . It is [] a situation where a term was employed by the Legislature which has an established meaning[.]") 262 Cal. Rptr. at 689.

Our determination of this issue is particularly reinforced by the Pennsylvania Supreme Court's handling of a nearly identical statutory issue. In *Kilmer*, the court was required to determine whether its minimum royalty statute permitted allocation or deduction of post-production expenses. Like the instant matter, the lessor/landowners "rel[ied] upon a century-old theory in oil and gas law placing an 'implied duty to market' upon gas companies[,]" which implied duty purportedly required gas companies to bear all costs until the product reached the market. 990 A.2d at 1152. The lessor/landowners likewise argued that the remedial "Guaranteed Minimum Royalty Act" was intended to "prevent deception and exploitation of Pennsylvania property owners by developers[.]" *Id.* at 1153. The lessor/landowners argued that the only way to ensure the statutory purpose of landowners being paid a minimum one-eighth royalty was to require gas companies to pay royalties on the amount received by the companies "when it sells the gas at the prevailing market price, and not the illusory value of the gas 'at the wellhead.'" *Id.* As in the instant case, the lessor/landowners further argued that the costs the gas companies sought to deduct were "subject to corporate manipulation and inflation[.]" *Id.*

Just as in the instant case, in *Kilmer*, the gas companies argued that the statute required royalties paid on gas which was "removed" from the property and that the gas was necessarily removed at the wellhead. *Id.* at 1154. Accordingly, they argued that they "must

33

work backward from the value-added price received at the point of sale by deducting the companies' costs of turning the gas into a marketable commodity" via the net-back method. *Id.* The gas companies explained that since their products were sold "at various points downstream from the wellhead in various states of production and that the further downstream the sale, the higher the price." *Id.* Critically noting that at the time the statute was enacted, "the wellhead was the point of royalty measurement," the gas companies argued that the net-back method "merely recreates the allocations that existed at the time the [statute] was enacted[.]" *Id.* at 1155.

Faced with precisely the same arguments and called upon to interpret whether its guaranteed minimum royalty statute permitted deduction of costs, the *Kilmer* court first noted that the statute was silent on this issue. *Id* at 1157. The court then concluded that "[g]iven the current state of the industry where the wellhead and the point of sale are not the same, we are required to interpret which valuation point is most consistent with the language of the statute." *Id.* Finding that the net-back method equalizes the royalty payable to the lessor regardless of where the "value-added" product is sold downstream, the *Kilmer* court held that its statute permitted the calculation of royalties at the wellhead utilizing the net-back method. *Id.* at 1158. The court dealt with the lessor/landowners' concerns about cost inflation by noting that "gas companies have a strong incentive to keep their costs down, as they will be paying seven-eighths of the costs," but that if the lessor suspects abuse of the cost allocation he or she may pursue an action in court. *Id.*; *accord, Atl. Richfield*, 262 Cal. Rptr. 683 (utilizing rules of statutory

34

construction to apply, rather than interpret, statute utilizing phrase "market value at the well").

Like the *Kilmer* court, it is the duty of this Court to determine precisely what the goal of West Virginia Code § 22-6-8 was at the time it was enacted and construe it in a fashion that most closely effectuates this purpose. While the language of West Virginia Code § 22-6-8 differs from that of the Pennsylvania statute, the import is the same: both were intended to guarantee a fair, minimum royalty to lessors calculated at the wellhead. The petitioners fail to persuade us that this purpose is undermined in any fashion through the pro-rata deduction or allocation of costs incurred to enhance the value of the oil or gas. Further, the plain and unambiguous language of the statute has a very precise meaning within the industry and the Legislature's use of that language at the time the statute was enacted clearly delineates the place of royalty valuation.

As a result, we are persuaded, as was the *Kilmer* court, that the most logical way to ascertain the wellhead price is, in fact, to deduct the post-production costs from the "value-added" downstream price in an effort to replicate the statutory wellhead value. The *Piney Woods* court explained that "to adjust for imperfect comparisons[,] . . . [p]rocessing costs may [] be deducted as an indirect means of determining what a buyer would have paid for the sour gas at the wellhead." 726 F.2d at 240. As the Michigan Court of Appeals similarly observed:

> *Basic principles of economics* require that, in determining the
> "gross proceeds at the wellhead" in the absence of an actual

35

> sale of gas at the wellhead resulting in ascertainable gross proceeds, the gross proceeds from a sale elsewhere must be extrapolated, backwards or forwards, to reflect appropriate adjustments due to differences in the location, quality, or characteristics of what is being sold. These principles apply to natural gas as well as to other sales.

*Schroeder v. Terra Energy, Ltd.*, 565 N.W.2d 887, 892 (Mich. Ct. App. 1997) (emphasis added).

The equity of this approach is readily apparent. As the *Schroeder* court explained, to allow calculation of royalties at downstream of the wellhead without concomitant cost allocation would inequitably increase royalties "as a function of defendant's own efforts to enhance the value of the gas through postproduction investments that it has exclusively underwritten." *Id.* at 894. Similarly, the Kentucky Supreme Court concluded that not only were cost deductions *not* in derogation of the "one-eighth at the well" language, but that refusal to allow all such deductions would result in the landowner receiving *more* than the agreed one-eighth:

> If the landowner's royalty is calculated on the amount received by the lessee downstream minus only transportation costs, the landowner receives *more* than one-eighth the value of the raw gas produced from his property, *i.e.,* he receives one-eighth of the value of the processed gas, an enhanced product, without having borne any of the costs associated with turning the raw gas into that more valuable product. The "first marketable product" approach, thus distorts the seven-eighths/one-eighth split of the "market price at the well" for which the parties contracted.

*Baker*, 473 S.W.3d at 595 (emphasis in original).

36

We are likewise left with the inescapable conclusion that the petitioners herein seek to unfairly maximize their royalty payments without commensurately bearing the cost of achieving that maximum value. With no hesitation, we conclude that the industry-recognized "net-back" or "work-back" method of royalty calculation is equally just to both parties and, more importantly, the closest appreciable method of effectuating what the Legislature envisioned.

Nevertheless, the petitioners insist that the remedial nature of the statute commands this Court to construe it in a manner which curtails the "mischief" and "evil intended to be suppressed." The "evil intended to be suppressed" through West Virginia Code § 22-6-8 is the payment of flat-rate royalties, which are not volume-based—no more, no less. Mere pro-rata allocation or deduction of post-production expenses which equally enhance the value of the oil or gas for both the lessee and lessor is a far cry from "evil" or "mischief," much less the type the statute was intended to eliminate.[18] Moreover, this

---

[18] That the petitioners characterize cost allocation as "evil" or "mischief" is unsurprising given the precedent which bizarrely describes such legitimate business accounting functions in a decidedly pejorative manner. As one commentator noted:

> The court in *Wellman* and *Tawney* takes a surprising and rather ill-informed view of the "net-back" method. Despite precedent that clearly permitted lessees to use the "net-back" or "work-back" method to calculate royalties, the court in *Wellman* seemed to believe that large gas companies had developed the "net-back" method as a sham for the purpose of cheating lessors.

Wheeler, *supra* at 28–29.

37

Court long ago recognized the appropriate limitations placed upon its duty to interpret statutory language: "The limits of the application of a statute are generally held to be coextensive with the . . . purpose it was intended to . . . effectuate, and neither stop short of, nor go beyond, the purpose which the Legislature had in view." Syl. Pt. 2, *City of Charleston v. Charleston Brewing Co.*, 61 W. Va. 34, 56 S.E. 198 (1906). The fact that the statute is remedial in purpose is an inadequate basis upon which to exceed its stated goals: "[T]he breadth of a statute or the duty to construe a remedial statute liberally can not amount to authority to a court to extend a statute to a case wholly beyond its effects." *Henthorn v. Collins*, 146 W. Va. 108, 111, 118 S.E.2d 358, 360 (1961).

Having deconstructed the first certified question to reach the issue underlying the parties' still-pending cause of action, we find it appropriate to reformulate it:

> When a certified question is not framed so that this Court is able to fully address the law which is involved in the question, then this Court retains the power to reformulate questions certified to it under both the Uniform Certification of Questions of Law Act found in *W. Va. Code*, 51-1A-1, *et seq.* and *W. Va. Code*, 58-5-2 [1967], the statute relating to certified questions from a circuit court of this State to this Court.

Syl. Pt. 3, *Kincaid v. Mangum*, 189 W. Va. 404, 405, 432 S.E.2d 74, 75 (1993). We therefore reformulate the first certified question into two questions as follows:

> Are royalty payments pursuant to an oil or gas lease governed by West Virginia Code § 22-6-8(e) (1994) subject to pro-rata deduction or allocation of post-production expenses by the lessee?

38

> May an oil or gas lessee utilize the "net-back" or "work-back"
> method to calculate royalties owed to a lessor pursuant to a
> lease governed by West Virginia Code § 22-6-8?

We answer both of the reformulated questions in the affirmative.

### E.  *Limitations on Cost Allocation or Deduction*

The foregoing notwithstanding, this Court further recognizes that simply permitting lessees to *carte blanche* allocate post-production costs without additional guidance is no more satisfying or equitable than was the previous majority's broad, impenetrable rule prohibiting such allocation.  Even courts in marketable product rule states are concerned with potential fraud or abuse, where costs are properly deductible:

> Some difficulty may arise in computing post-production
> marketing costs if the operations necessary to prepare the
> product for market, and operations to enhance the value of a
> marketable product, occur at the same facility. When the same
> company both extracts and processes the gas all operating costs
> must be closely scrutinized. . . . . Such a determination is a
> question of fact to be decided based on competent evidence in
> the record.

*Garman*, 886 P.2d at 661, n. 28 (citing *Amoco Production Co. v. First Baptist Church of Pyote*, 579 S.W.2d 280 (Tex. Civ. App. 1979)).[19]

---

[19]Moreover, in *Tara Petroleum Corp. v. Hughey*, 630 P.2d 1269, 1275 (Okla. 1981), the court cautioned that

> Courts should take care not to allow lessors to be deprived or
> defrauded of their royalties by their lessees entering into
> illusory or collusive assignments or gas purchase contracts.
> Whenever a lessee or assignee is paying royalty on one price,

Some limitations on the deductibility or apportionment of costs, however, do not derive of fraud or self-dealing, but rather, the law's unwavering requirement of reasonableness as both a guiding and limiting factor. Despite its resistance to cost allocation, even the *Wellman* Court recognized and explicitly held that where costs are properly allocated or deducted, "the lessee must prove, by evidence of the type normally developed in legal proceedings requiring an accounting, that he, the lessee, actually incurred such costs and that they were reasonable." Syl. Pt. 5, in part, *Wellman*. *See also Piney Woods*, 726 F.2d at 241 ("[T]he processing costs . . . must be reasonable."); *Garman*, 886 P.2d at 661 ("To the extent that certain processing costs enhance the value of an already marketable product the burden should be placed upon the lessee to show such costs are reasonable[.]"); *Babin v. First Energy Corp.*, 693 So.2d 813, 815-16 (La. Ct. App. 1997) ("In addition to the character or nature of the costs deducted is the question of the reasonableness of the *amount* deducted." (emphasis in original)); *Bice*, 768 N.W.2d at 504 ("[W]hether a charge is commercially reasonable is a question of fact[.]").[20]

---

but on resale a related entity is obtaining a higher price, the lessors are entitled to their royalty share of the higher price. The key is common control of the two entities.

[20] The *Babin* court likewise noted that "the deductibility of any cost may be determined with reference to its nature" and "should focus primarily on the propriety of the deduction in light of acceptable cost accounting standards" and include "all relevant costs." 693 So.2d at 815. We recognize that additional issues may arise with respect to the propriety of certain deductions. We leave those issues to be decided upon a developed record where such issues are properly presented. "We have traditionally maintained that

We therefore hold that royalty payments pursuant to an oil or gas lease governed by West Virginia Code § 22-6-8(e) may be subject to pro-rata deduction or allocation of all reasonable post-production expenses actually incurred by the lessee. Therefore, an oil or gas lessee may utilize the "net-back" or "work-back" method to calculate royalties owed to a lessor pursuant to a lease governed by West Virginia Code § 22-6-8(e). The reasonableness of the post-production expenses is a question for the fact-finder.

As a final matter, we note the petitioners' foreboding contention that the resolution reached herein creates a conflict with leases which remain subject to *Wellman's* and *Tawney's* prohibition on such cost allocation, save express language in the lease permitting such allocation. The petitioners maintain that this leads to an impermissible "inconsistent" result. *See Expedited Transp. Sys., Inc. v. Vieweg,* 207 W. Va. 90, 98, 529 S.E.2d 110, 118 (2000) ("It is the 'duty of this Court to avoid whenever possible a construction of a statute which leads to absurd, inconsistent, unjust or unreasonable results.'" (quoting *State v. Kerns,* 183 W. Va. 130, 135, 394 S.E.2d 532, 537 (1990)). However, as previously indicated, the leases at issue herein are flat-rate leases, the royalty provisions of which have been amended by operation of West Virginia Code § 22-6-8 and the required permitting affidavit outlined therein. The leases in *Wellman* and *Tawney* and

upon receiving certified questions we retain some flexibility in determining how and to what extent they will be answered." *City of Fairmont v. Retail, Wholesale, & Dep't Store Union, AFL-CIO*, 166 W. Va. 1, 3-4, 283 S.E.2d 589, 590 (1980).

other such leases obviously are unaffected by the statute and therefore this opinion. Accordingly, we find no inconsistent result where two distinct types of leases of completely differing character are involved, one type of which is the product of free and open negotiation and the other encumbered by operation of statute. Nevertheless, this Court recognizes the inherent tension between holders of leases subject to our interpretation of West Virginia Code § 22-6-8 and those freely-negotiated leases which remain subject to the holdings of *Wellman* and *Tawney*. We therefore implore the Legislature to resolve the tensions as it sees fit inasmuch as this Court may only act within the confines of our constitutional charge.[21]

## IV. CONCLUSION

For the reasons set forth hereinabove, we answer the reformulated certified questions in the affirmative.

---

[21] In fact, we observe that a member of the House of Delegates introduced a bill in the 2017 regular Legislative session purporting to amend West Virginia Code § 22-6-8. The introduced bill specifically implicated the "at the wellhead" language and stated that it was intended to "[c]larify[] the intent of gas royalty leases which required not less than 1/8th (12.5%) of the total amount paid to, received by or delivered to the owner [of the working interest]." *See* H. B. 3042 (Regular Session, 2017). However, the bill appears to have died in Committee.

42

Certified Questions Answered.