**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1334**

TRAVIS YOUNG; MICHELLE BEE YOUNG,

Plaintiffs − Appellees,

v.

EQUINOR USA ONSHORE PROPERTIES, INC.,

Defendant – Appellant,

and

SWN PRODUCTION COMPANY; STATOIL USA ONSHORE PROPERTIES, INC.,

Defendants.

------------------------------

THE WEST VIRGINIA OIL AND NATURAL GAS ASSOCIATION; THE INDEPENDENT OIL AND GAS ASSOCIATION OF WEST VIRGINIA, INC.,

Amici Supporting Appellant.

**No. 19-1335**

TRAVIS YOUNG; MICHELLE BEE YOUNG,

Plaintiffs − Appellees,

v.

SWN PRODUCTION COMPANY,

Defendant – Appellant,

and

STATOIL USA ONSHORE PROPERTIES, INC.; EQUINOR USA ONSHORE PROPERTIES, INC.,

Defendants.

------------------------------

THE WEST VIRGINIA OIL AND NATURAL GAS ASSOCIATION; THE INDEPENDENT OIL AND GAS ASSOCIATION OF WEST VIRGINIA, INC.,

Amici Supporting Appellant.

Appeal from the United States District Court for the Northern District of West Virginia, at Wheeling.  John Preston Bailey, District Judge.  (5:17-cv-00082-JPB)

Argued:  September 10, 2020                     Decided:  December 1, 2020

Before DIAZ, THACKER, and HARRIS Circuit Judges.

Vacated and remanded by published opinion.  Judge Diaz wrote the opinion, in which Judge Thacker and Judge Harris joined.

**ARGUED:**  Elbert Lin, HUNTON ANDREWS KURTH, LLP, Richmond, Virginia, for Appellants.  Jeremy Matthew McGraw, BORDAS & BORDAS, PLLC, Moundsville, West Virginia, for Appellees.  **ON BRIEF:**  Ryan A. Shores, William J. Haun, SHEARMAN & STERLING LLP, Washington, D.C.; Bridget D. Furbee, Kristen Andrews Wilson, STEPTOE & JOHNSON PLLC, Bridgeport, West Virginia, for Appellant Equinor USA Onshore Properties Inc.  Marc S. Tabolsky, SCHIFFER HICKS JOHNSON PLLC, Houston, Texas; Timothy M. Miller, Katrina N. Bowers, BABST CALLAND, Charleston, West Virginia, for Appellant SWN Production Company, LLC.  James G. Bordas, Jr.,

2

BORDAS & BORDAS, PLLC, Wheeling, West Virginia, for Appellees.  Don C.A. Parker, William M. Herlihy, SPILMAN THOMAS & BATTLE, PLLC, Charleston, West Virginia, for Amici Curiae.

———————————

DIAZ, Circuit Judge:

Equinor USA Onshore Properties and SWN Production Company appeal a district court's decision granting summary judgment in favor of Travis Young and Michelle Bee Young. The Youngs sued Equinor and SWN to challenge the deduction of post-production costs from royalties paid to the Youngs pursuant to an oil and gas lease between the parties. The district court agreed with the Youngs, holding that the lease failed to properly provide for the method of calculating post-production costs. But we reach the opposite conclusion. Accordingly, we vacate the judgment and remand for the district court to enter judgment for SWN and Equinor.

I.

A.

The Youngs are the lessors of 69.5 acres of land in Ohio County, West Virginia (the "Property"). SWN (as the lessee) and Equinor (as an assignee under the lease) have the rights to drill and operate wells on the Property for the production and sale of oil and gas. In exchange, the Youngs receive royalties based on a share of the proceeds. Specifically, the royalty clause in the "PAYMENTS TO LESSOR" section of the lease states:

> (B) ROYALTY: To pay Lessor as Royalty, less all taxes, assessments, and adjustment on production from the Leasehold, as follows:
>
> . . . .
>
> 2. GAS: To pay Lessor on actual volumes of gas sold from said land, fourteen percent of the net amount realized by Lessee, computed at the wellhead. As used in this Lease, the term 'net amount realized by Lessee, computed at the

4

wellhead' shall mean the gross proceeds received by Lessee from the sale of oil and gas minus post-production costs incurred by Lessee between the wellhead and the point of sale. As used in the Lease, the term 'post-production costs' shall mean all costs and expenses of (a) treating and processing oil and/or gas, and (b) separating liquid hydrocarbons from gas, other than condensate separated at the well, and (c) transporting oil and/or gas, including but not limited to transportation between the wellhead and any production or treating facilities, and transportation to the point of sale, and (d) compressing gas for transportation and delivery purposes, and (e) metering oil and/or gas to determine the amount sold and/or the amount used by Lessee, and (f) sales charges, commissions and fees paid to third parties (whether or not affiliated) in connection with the sale of the gas, and (g) any and all other costs and expenses of any kind or nature incurred in regard to the gas, or the handling thereof, between the wellhead and the point of sale. Lessee may use its own pipelines and equipment to provide such treating, processing, separating, transportation, compression and metering services, or it may engage others to provide such services; and if Lessee uses its own pipelines and/or equipment, post-production costs shall include without limitation reasonable depreciation and amortization expenses relating to such facilities, together with Lessee's cost of capital and a reasonable return on its investment in such facilities . . . .

J.A. 55–56.

In short, the royalty clause (1) grants the Youngs a royalty share equal to "fourteen percent of the net amount realized" by SWN and Equinor; (2) states that post-production costs shall be deducted from the "gross proceeds" to calculate the net amount realized; (3) specifies seven types of such post-production costs, including a "catchall" provision for "any and all other" post-production costs; and (4) allows SWN and Equinor to either contract with others to perform the post-production operations or perform them using their own pipelines and equipment, in which case post-production costs also include the "reasonable depreciation and amortization expenses related to such facilities, together with Lessee's cost of capital and a reasonable return on its investment." *Id.*

5

Two other lease provisions are relevant to this appeal. First, the lease provides that royalty payments shall be proportional to the Youngs' actual ownership percentage of the Property in the event that they divest some of their leased fee interest. J.A. 56. Second, the lease allows SWN and Equinor to pool or combine the Property with other lands to create drilling or production "units." *Id*. In the event of such pooling, which occurred here, royalty payments shall be proportional to the Property's share of the total land acres included in the unit. *Id.*

The lease also expressly disclaims a duty to market the resources on the Property during the "primary term or any extension of term of this Lease." *Id*. In the absence of such a provision, West Virginia's default rule is "that a lessee impliedly covenants that he will market oil or gas produced" on leased land. *Wellman v. Energy Resources, Inc.*, 557 S.E.2d 254, 265 (W. Va. 2001). The "primary term" refers to the original five-year term of the lease, which ran from September 8, 2009 to September 8, 2014. J.A. 55. The lease has since been extended indefinitely.

In April 2016, SWN began deducting post-production costs from the Youngs' royalty payments.[1] The Youngs objected, contending that deductions were not allowed under West Virginia law. SWN responded that the lease provided for the deductions, which were calculated by "tak[ing] their decimal interest in the unit," or the fraction that

---

[1] Before then, SWN had chosen not to deduct such costs. The record is silent as to the reason for the change.

the Property bears in relation to the total pooled acreage, "and multiply[ing] it times each specific deduction" in the lease. J.A. 59.

B.

Not satisfied with that explanation, the Youngs sued in state court for damages and a declaratory judgment that the lease failed to satisfy West Virginia's requirements for allocating post-production costs to the lessors in an oil and gas lease under *Estate of Tawney v. Columbia Natural Resources, LLC*, 633 S.E.2d 22 (W. Va. 2006).

In *Tawney*, the West Virginia Supreme Court of Appeals held that an oil and gas lease must satisfy a three-pronged test to rebut a presumption that the lessee bears all post-production costs and to thereby allocate some of those costs to the lessor. 633 S.E.2d at 30. Specifically, the lease must (1) "expressly provide that the lessor shall bear some part of the [post-production] costs"; (2) "identify with particularity the specific deductions the lessee intends to take from the lessor's royalty"; and (3) "indicate the method of calculating the amount to be deducted from the royalty for such post-production costs." *Id.*

SWN and Equinor removed the case to the Northern District of West Virginia. At the close of discovery, the parties filed cross-motions for summary judgment. The district court granted summary judgment to the Youngs, holding that the lease failed to properly provide for the method of calculating the amount to be deducted from the Youngs' royalties under *Tawney*.

In lieu of conducting a trial on damages, the parties stipulated "that the sum of $6,980.94 against Equinor and $36,633.30 against SWN shall be treated as if it were the

7

jury's verdict" against SWN and Equinor, subject to their right to appeal. J.A. 75. The district court entered judgment accordingly, and this appeal followed.

## II.

SWN and Equinor contend that they properly deducted post-production costs from the Youngs' royalty payments either because the lease satisfies *Tawney*'s requirements for deducting such costs, or because the lease's disclaimer of the implied duty to market means that it's not subject to *Tawney* at all. Alternatively, SWN and Equinor ask us to certify two questions to the West Virginia Supreme Court of Appeals: (1) whether *Tawney* remains good law; and if so, (2) whether the lease suffices under *Tawney* to allocate post-production costs to the lessor.

As we explain, the lease provisions regarding royalty payments satisfy *Tawney* and are otherwise consistent with West Virginia law. The district court erred in holding otherwise. We therefore vacate the district court's judgment, finding it unnecessary to certify any issue of state law. *See Roe v. Doe*, 28 F.3d 404, 407 (4th Cir. 1994) ("Only if the available state law is clearly insufficient should the court certify the issue to the state court.").

## A.

We review the district court's ruling on cross-motions for summary judgment de novo. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013). We also review de novo the district court's contract interpretation underlying its summary judgment ruling.

8

*FindWhere Holdings, Inc. v. Sys. Env't Optimization, LLC*, 626 F.3d 752, 755 (4th Cir. 2010).

B.

Because this case invokes our diversity jurisdiction, we apply controlling state law on settled issues and predict how the state's highest court would rule on unsettled issues. *See McFarland v. Wells Fargo Bank, N.A.*, 810 F.3d 273, 279 (4th Cir. 2016). Thus, we summarize the relevant decisions of the West Virginia Supreme Court of Appeals.

We begin with *Wellman v. Energy Resources, Inc.*, 557 S.E.2d 254 (W. Va. 2001). In that case, West Virginia's high court held that where "an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale." *Id.* at 265. The court reasoned that the lessee's implied duty to market the minerals produced on leased property makes the lessee presumptively responsible for all post-production costs until the product is sold. *Id.* at 264–65. Thus, for a lessor to share in post-production costs, *Wellman* instructs that a lease must expressly allocate such costs to the lessor and that the lessee must prove that it "actually incurred such costs and that they were reasonable." *Id.* at 265.

*Tawney* expanded on the court's analysis in *Wellman*. As we noted earlier, *Tawney* explained that an oil and gas lease that intends to allocate post-production costs between the lessor and lessee must: (1) "expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale"; (2) "identify with particularity

9

the specific deductions the lessee intends to take from the lessor's royalty"; and (3) "indicate the method of calculating the amount to be deducted from the royalty for such post-production costs." 633 S.E.2d at 30. Applying this test, *Tawney* held that lease language that provides for the lessor's royalty to be calculated "at the wellhead" is ambiguous, and therefore fails to rebut the *Wellman* presumption under the first prong. *Id.*

The West Virginia Supreme Court of Appeals most recently expounded on *Wellman* and *Tawney* in *Leggett v. EQT Production Co.*, 800 S.E.2d 850 (W. Va. 2017). There, the court considered whether those cases applied in the context of West Virginia Code section 22-6-8(e) (1994), which provides that a lessee must pay to the lessor "not less than one eighth of the total amount paid to or received . . . at the wellhead for the oil and gas" extracted from wells leased at a flat rate.[2]

The lessors there argued that the statute's "at the wellhead" language was inadequate for the reasons explained in *Tawney*, such that the lessees couldn't overcome the *Wellman* presumption and deduct post-production costs from the lessors' flat-rate royalties. *Leggett*, 800 S.E.2d at 854. The court ultimately concluded that *Wellman* and *Tawney*'s common law principles didn't inform the interpretation of the statute, and that the statute permitted the deduction of post-production costs. *Id.* at 862. But in doing so,

---

[2] The lease in *Leggett* "provide[d] for payment of a sum certain per well, per year," and was thus subject to the statute. 800 S.E.2d at 853. By contrast, the Youngs receive royalties that vary based on a percentage of the net proceeds realized by SWN and Equinor.

the court went out of its way to "illustrate the faulty legs" upon which *Wellman* and *Tawney* "purport[ ] to stand." *Id.*

The court recited an array of "stinging" criticism from scholars complaining that *Wellman* and *Tawney* rest on an "unwillingness to accept the realities of deregulation in the natural gas market." *Id.* at 863. From 1938 until the "deregulation" that occurred in 1993, buyers "purchased gas at or near the wellhead, thereby absorbing most post-wellhead [i.e., post-production] costs." *Id.* at 857 n.10. Today, however, "most gas is purchased away from the wellhead," giving rise to vastly greater post-production costs incurred by the seller. *Id.* Given this new reality, the court hinted (without formally holding) that *Wellman* and *Tawney* are "nothing more than a re-writing of the parties' contract to take money from the lessee and give it to the lessor." *Id.* at 863.

*Leggett* did, however, expressly reject *Tawney*'s assertion that the phrase "at the wellhead" is facially ambiguous. Instead, it interpreted the statutory phrase to require the calculation of royalties based on "the value of the gas at the well, before it is transported, treated, compressed or otherwise prepared for market." *Id.* at 864–65. The court determined that "the most logical way to ascertain the wellhead price" under section 22-6-8 is "to deduct the post-production costs from the 'value-added' downstream price."[3] *Id.* at 866. This "'work-back' method of royalty calculation" prevents lessors from "unfairly

_____

[3] The downstream price is the value of the resources when sold, which reflects the value of the raw resources at the point of extraction (the wellhead price) plus any added value from post-production services (such as treatment and transportation).

maximiz[ing] their royalty payments without commensurately bearing the costs of achieving that maximum value." *Id.* at 867.

Reading these cases together, we glean the following principles of West Virginia law: An oil and gas lease must satisfy *Tawney*'s three-pronged test to rebut the *Wellman* presumption that the lessee will bear all post-production costs. And although *Leggett* didn't overrule *Wellman* and *Tawney*, its criticism of those cases and its endorsement of the work-back method inform our analysis here.

C.

Having sketched out the relevant West Virginia law, we turn to SWN and Equinor's argument that the lease meets *Tawney*'s three-pronged test.

The parties agree that the lease expressly provides that the Youngs will bear post-production costs, satisfying the first prong. For the most part, the parties also agree that the lease identifies post-production costs with particularity, thus satisfying the second prong.

The Youngs half-heartedly argue that the catchall and depreciation provisions fail the second prong. But they don't identify any deductions actually taken under the catchall provision that would affect our analysis. Nor do we see any imprecision or impropriety in the depreciation provision, so long as the costs deducted are limited to those accrued while providing post-production services—a restriction conceded by SWN and Equinor. Thus, the lease satisfies *Tawney*'s second prong.

12

The parties' dispute centers on the third prong—that is, whether the lease adequately "indicates the method of calculating the amount to be deducted from the royalty for such post-production costs." *Tawney*, 633 S.E.2d at 30. The district court found that the lease fails on this third prong of *Tawney* because it "merely states that the lessee will deduct post-production costs," yet "says absolutely nothing as to how those costs would be calculated, other than to leave the amount of the deduction wholly to the lessee's discretion." J.A. 66. In short, said the court, the lease lacks a "mathematical formula" that would constitute a "method of calculation." J.A. 67.

We disagree. *Tawney* doesn't demand that an oil and gas lease set out an Einsteinian proof for calculating post-production costs. By its plain language, the case merely requires that an oil and gas lease that expressly allocates some post-production costs to the lessor identify *which* costs and *how much* of those costs will be deducted from the lessor's royalties. These conditions may be satisfied by a simple formula, like the one here.

To begin, the very notion of deduction implies the first component of the formula: We subtract "some part" of the post-production costs specified in the lease from the pot of money from which the royalty percentage is calculated. *Tawney*, 633 S.E.2d at 30. Here, the lease tells us that this sum consists of "the gross proceeds received by Lessees from the sale of . . . gas." J.A. 55.

To determine the precise amount of the specified post-production costs to be deducted from the "gross proceeds" and arrive at the "net amount," we add up "all" of the receipts corresponding to the costs specifically enumerated in the lease and, if applicable,

13

in the depreciation clause. *See* J.A. 55–56 ("[T]he term 'net amount realized by Lessee, computed at the wellhead' shall mean the gross proceeds received by Lessee from the sale of oil and gas *minus post-production costs* incurred by Lessee between the wellhead and the point of sale . . . . [T]he term "post-production costs" *shall mean all costs and expenses* of (a) . . . , and (g) . . . . [and] reasonable depreciation and amortization expenses . . . ." (emphases added)).

The Youngs argue that the depreciation clause introduces ambiguity by permitting deductions of "reasonable" depreciation expenses. Not so. Recall that *Wellman* itself requires that all post-production costs deducted must be "reasonable" and "actually incurred." 557 S.E.2d at 265. "'Reasonableness' is a common legal standard that has been used by courts for more than a century" and simply limits any deductions to those that are rationally related to the specified categories of post-production costs. *W.W. McDonald Land Co. v. EQT Prod. Co.*, 983 F. Supp. 2d 790, 808 (S.D. W. Va. 2014).

Thus, the royalty provision tells us all we need to know to determine "the amount to be deducted from the royalty for such post-production costs." *See Tawney*, 633 S.E.2d at 30. To calculate the Youngs' royalty payment, we then multiply the "net amount realized by Lessee" by 0.14, or 14 percent.

The Youngs also contend that the lease fails *Tawney*'s third prong because the royalty clause fails to apportion the costs between lessors. But as SWN and Equinor point out, the lease deals with that issue elsewhere. Specifically, the lease explains how to adjust the overall calculation of royalties in the event that the Youngs transfer some of their

14

interest in the Property: by multiplying the "net amount realized" by the fraction of the Property they still own. And it describes how to adjust the calculation where, as here, SWN and Equinor have pooled the Property with other production units: by multiplying the "net amount realized" by the fraction that the Property bears in relation to the total pooled acreage.

In setting out these methods for calculating not only the amount of designated post-production costs to be deducted, but also the pool from which to deduct them, and the manner in which to arrive at the ultimate royalty payment, the lease effectively mirrors the work-back method of calculation approved in *Leggett*. *See* 800 S.E.2d at 867. Recall that, under that method, one simply "deduct[s] the post-production costs from the 'value-added' downstream price" that the gas fetches at the market. *Id.* at 866. Because that's exactly what the lease here does, it follows that the language at issue bears the same "precise and definite meaning" that *Leggett* approved. *Id.* at 865.

The Youngs' retort practically proves the point. According to them, the lease fails on *Tawney*'s third prong because it doesn't include the "exact same explanation" that SWN provided when the Youngs first objected to the deduction of post-production costs. The problem with that claim is that the lease recites the very same formula that SWN conveyed to the Youngs.

The district court's view of why the lease lacks a method for calculating the amount of post-production costs to be deducted is similarly unpersuasive. At bottom, the court failed to recognize that the lease's directive to add all of the specified, reasonable, and

15

actually incurred post-production costs, then subtract that figure from the gross proceeds, and finally multiply that sum by 0.14 as well as the Youngs' fractional share of the total pooled acreage, suffices as a method of calculation.

As support for its contrary view, the district court relied on its own prior decision in *Kay Co., LLC v. EQT Production Co.*, No. 1:13-cv-151 (N.D. W. Va. Jan. 5, 2018), in which it held that a lease providing for the deduction of "reasonable" and "actually incurred" post-production costs didn't specify a method for calculating the amount to be deducted. J.A. 66–71. To the extent *Kay Co.* mirrors the district court's analysis here, we think it too was wrongly decided. But we note that the real problem in *Kay Co.* appears to be that the lease in question didn't "identify with particularity the specific deductions" as required by *Tawney*'s second prong. That caused the district court there to question whether "post-production costs" included "meals and entertainment, uniforms, meter operations and repair," and a variety of other expenses. J.A. 71. The same can't be said here, as the lease undoubtedly satisfies *Tawney*'s second prong.

In sum, we are satisfied that the lease suffices under *Tawney* to indicate the method for calculating the amount of post-production costs to be deducted when calculating the Youngs' royalties. That method is simply to add up all of the identified, reasonable, and actually incurred post-production costs, and deduct them from SWN and Equinor's gross proceeds. The amount is then adjusted for the Youngs' fractional share of the total pooled acreage and their royalty rate. Especially in light of *Leggett*, West Virginia law demands nothing more.

16

\*   \*   \*

We therefore vacate the district court's grant of summary judgment to the Youngs and remand the case to the district court to enter judgment for SWN and Equinor.

*VACATED AND REMANDED*