No. 23-522 –   *Francis Kaess v. BB Land, LLC*

**FILED**
**November 14, 2024**
released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Justice Hutchison, concurring:

I concur with the majority's opinion finding the duty to market and the marketable-product rules extend to in-kind leases.  I write separately to emphasize that the opinion's analysis of the duties implied under the marketable-product rule accord with principles of *stare decisis*.  The West Virginia Legislature, West Virginia's executive agencies, and the United States Government have also adopted the marketable-product rule in varying fashions.  The marketable-product rule is, for all intents and purposes, the majority rule in America.

The marketable-product rule (sometimes called the "marketable-condition rule") is one of the many duties implied into oil and gas leases.  Courts imply lots of terms, rules, duties, and/or covenants (however one may characterize them), into oil and gas leases because they either (a) make the leases function as the parties initially intended, or (b) are so obvious that the parties often never openly discuss them or include them in their writings.  For instance, we imply a duty of good faith into every contract, deed, and lease; it makes the parties' agreement work smoothly irrespective of whether the parties discussed it.  For oil and gas leases, courts imply a duty to drill a well, a covenant to protect the leasehold from drainage, obligations to reasonably develop the land, to explore further, and

1

to conduct all operations affecting the lessor with reasonable care and diligence.[1]  It is well settled that the parties may modify or negate these implied covenants *by agreement*.

Relevant here is that courts also imply a duty on the part of the lessor-producer to take the oil and gas to market[2], and the majority opinion properly recognizes in Syllabus Point 5 that the implied duty to market applies to in-kind deeds.  The marketable-product rule discussed in Syllabus Point 6 is merely an off-shoot of the duty to market; having an obligation to take a product to market when it will not sell is meaningless.  Hence, when applying the duty to market oil and gas, courts have also applied the marketable-product rule, which says: within every oil and gas lease, there is an implied covenant that the lessee-producer will take reasonable measures, at no cost to the lessor-royalty owner, to process the oil and gas into a form that can be profitably marketed.  The

---

[1] *See, e.g.*, *Am. Energy Serv. v. Lekan*, 598 N.E.2d 1315, 1321 (Ohio App. 1992) (listing duties found in 5 Williams & Meyers, Oil and Gas Law (1991).  *See also Adkins v. Huntington Development & Gas Co*., 113 W.Va. 490, 168 S.E. 366 (1933) (there is an implied obligation for an oil and gas lessee to protect the leased premises from drainage caused by wells placed on adjacent property); *United Fuel Gas Co. v. Smith*, 93 W. Va. 646, 117 S.E. 900, 904 (1923) ("[T]here is always implied in every oil and gas lease a covenant to drill the number of wells reasonably necessary to develop the property and prevent drainage by operation on adjoining lands.").

[2] *See generally*, Keith B. Hall, *Implied Covenants and the Drafting of Oil and Gas Leases*, 7 LSU J. Energy L. & Resources 401, 418 (2019) ("The implied covenant to market requires a lessee to diligently seek purchasers at a reasonable price for any oil or gas that is found in paying quantities."); Nancy Saint-Paul, 2 *Summers Oil and Gas* § 18:11 (3d ed. 2021) ("In order to carry out the purposes for which an oil and gas lease is made, that is, the . . . production and sale [of oil and gas] so as to yield a profit to the lessee and a return to the lessor in the form of rents and royalties, it is necessary that the oil or gas produced from the land be marketed.").

marketable-product rule simply reflects the reality that oil and gas are usually unmerchantable and unusable in their natural forms. Both oil and gas come to the surface at pressures, and chock full of hydrocarbon chains like "natural gas liquids,"[3] hydrogen sulfide, and other contaminants, that are not conducive to easy sales in impartial, arms-length oil and gas markets. The costs of creating a marketable product are, implicitly, to be borne by the producer because royalty owners have no concept or control of the measures that might be taken by the producer to create a salable product.

The covenants discussed by the majority opinion are defended by the doctrine of *stare decisis*. Courts abide by the doctrine of *stare decisis* because it "promotes certainty, stability and uniformity in the law. It should be deviated from only when urgent reason requires deviation." *Dailey v. Bechtel Corp.*, 157 W. Va. 1023, 1029, 143 S.E.2d 169, 173 (1974). The doctrine

> rests upon the principle that law by which men are governed should be fixed, definite, and known, and that, when the law is declared by [a] court of competent jurisdiction authorized to construe it, such declaration, in absence of palpable mistake or error, is itself evidence of the law until changed by competent authority.

---

[3] Natural gas liquids – also called lease condensate, natural gasoline, or NGLs – are "nonmethane constituents" that are extracted from natural gas wells such as "ethane, propane, butane, pentanes, and higher molecular weight hydrocarbon constituents which can be separated as liquids during gas processing." James G. Speight, *Handbook of Industrial Hydrocarbon Processes*, § 2.2.3 (2d Ed. 2020). "While NGLs are gaseous at underground pressure, the molecules condense at atmospheric pressure and turn into liquids. . . . Natural gas that contains a lot of NGLs and condensates is referred to as *wet gas*, while gas that is primarily methane, with little to no liquids in it when extracted, is referred to as *dry gas*." *Id.*

3

*In re Proposal to Incorporate Town of Chesapeake, Kanawha Cnty*., 130 W. Va. 527, 536, 45 S.E.2d 113, 118 (1947).

In support of its opinion, the majority concisely recounts the two decades of our jurisprudence on the marketable-product rule that created a fixed, definite, and well-known-to-the-industry rule: in the absence of conflicting contractual language, it is implied in every oil-and-gas lease that a lessee-producer cannot deduct from the lessor-mineral owner's royalties any costs incurred in getting the oil or gas from the well to market. If the producer must process the oil or gas to make it marketable and sellable, the producer will bear those costs unless the lease says otherwise. The majority opinion cogently summarizes that the rule began in 2001 with *Wellman*;[4] how the rule was expounded upon and clarified in *Tawney*;[5] how the marketable-product rule was pointlessly criticized in *Leggett*[6] such that the Legislature proceeded to overrule *Leggett* barely nine months later;[7] and how the rule was again reaffirmed in 2022 in *Kellam*.[8] This rule logically applies to both proceeds leases and in-kind leases.

---

[4] *Wellman v. Energy Res., Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001).

[5] *Est. of Tawney v. Columbia Nat. Res., L.L.C.*, 219 W. Va. 266, 633 S.E.2d 22 (2006).

[6] *Leggett v. EQT Prod. Co.*, 239 W. Va. 264, 800 S.E.2d 850 (2017).

[7] The *Leggett* opinion was issued on May 26, 2017; the Legislature passed West Virginia Code § 22-6-8(e) and overturned *Leggett* on March 2, 2018.

[8] *SWN Prod. Co., LLC v. Kellam*, 247 W. Va. 78, 875 S.E.2d 216 (2022).

My dissenting colleagues shrug off the majority's discussion of these last two decades of our common law as a "walk down memory lane" before vilifying the marketable-product rule as "audacious" and decrying that the majority opinion "commandeered thousands of leases across the State for judicial revision."[9] They state that a rule placing the burden on producers to get oil and gas into a marketable condition "take[s] money from the producers to give it to the royalty owners."[10]

As I explained in my much-more-detailed concurrence to *Kellam*, the marketable-product rule is not "some modern-day, wealth-redistribution scheme to rewrite oil and gas leases to take money from the lessee and give it to the lessor." *Kellam*, 247 W. Va. at 92, 875 S.E.2d 230 (Hutchison, J., concurring). Rather, the rule dates back over eight decades, to the writings of two titans of oil and gas law: Professor Maurice H. Merrill ("No part of the costs of marketing or of preparation for sale is chargeable to the lessor.")[11] and Eugene Kuntz ("Unquestionably, under most leases, the lessee must bear all costs of

---

[9] ___ W. Va. at ___, ___ S.E.2d at ___ (Walker, J., dissenting) (Slip. Op. at 9-10). I am unclear where my colleagues see in the record that there are "thousands" of in-kind leases in West Virginia. One commentator noted, in 1976, that "[u]ntil recently, very few leases granted by private landowners provided for the taking of royalty gas in kind." Richard S. Morris, *Taking Royalty Gas in Kind*, 22 Rocky Mtn. Min. L. Inst. 25 (1976)

[10] ___ W. Va. at ___, ___ S.E.2d at ___ (Walker, J., dissenting) (Slip. Op. at 1).

[11] Maurice H. Merrill, *The Law Relating to Covenants Implied in Oil and Gas Leases* § 85, at 214-15 (2d ed. 1940).

production.").[12]  I pointed out in *Kellam* that modern-day critiques of the marketable-product rule are, more often than not, "biased nonsense" that describe the rule as a "windfall for lessors" or "a judicially directed wealth transfer" shifting post-production costs from lessors to lessees.[13]  These current critiques are usually nothing more than bad scholarship published with an eye toward driving successful results for one party or the other (but not royalty owners) in the courts.

For all of my dissenting colleagues' arguments that this Court should adopt a course different from *Wellman*, *Tawney*, and *Kellam*, I must point out the obvious: the dissenting position on the marketable-product rule is contrary to the expressed positions of the Legislature, the Executive branch, and the United States Government all.

Starting with the Legislature, since this Court's issuance of *Wellman* in 2001, the Legislature has never seen fit to pass a law altering its holding.  To the contrary, I can find three instances where the Legislature expressly incorporated the marketable-product rule into West Virginia's laws.  First, within nine months after *Leggett* was issued (where this Court refused to apply the marketable-product rule to flat-rate leases), the Legislature overruled *Leggett* and adopted a statute expressly incorporating the marketable-product

---

[12] Eugene Kuntz, *A Treatise on the Law of Oil and Gas* § 40.5 (1962).

[13] *Kellam*, 247 W. Va. at 92, 875 S.E.2d at 230 (Hutchison, J., concurring).

rule and prohibiting deductions from royalties, generated under a flat-rate lease, for post-production expenses.[14]

Second, my dissenting colleagues seem to insist that producing oil and gas is an adventure whose costs should be shared proportionally by both the lessor and the lessee-producer. But this position is contradicted by the Legislature's tax statutes. When a producer's working interest in a well producing oil, natural gas, or natural gas liquids is valued for property tax purposes, state law gives *all* of the tax benefits for post-production costs to the producer alone. Every one of them. The lessor who receives only royalties gets *no* tax benefits under state law for post-production costs. State law directs the tax commissioner to value an operator's well using a model that deducts from the operator's taxes "lease operating expenses, lifting costs, gathering, compression, processing, separation, fractionation, and transportation costs" as well as "the actual costs incurred to bring the subsurface materials (oil, natural gas, and natural gas liquids) up to the surface and convert them to marketable products." W. Va. Code §§ 11-1C-10(d)(3)(B)(i), (iv), and (x).[15] My dissenting colleagues insist that the royalties of lessors should be reduced

---

[14] The law provided that royalties on flat rate leases must be paid "free from any deductions for post-production expenses, received at the first point of sale to an unaffiliated third-party purchaser in an arm's length transaction for the oil or gas so extracted, produced or marketed." W. Va. Code § 22-6-8 (2018).

[15] In general, W. Va. Code § 11-1C-10(d)(3) (2024) requires taxes to be assessed on "property producing oil, natural gas, natural gas liquids, or any combination thereof" at the fair market value under a yield capitalization model applied to the net proceeds from the well. The term "net proceeds" is, essentially, all gross receipts less lease operating expenses:

because the burden of post-production costs should be shared, yet they ignore that tax benefits that flow from post-production costs flow only to the producers. In other words, through deductions conferred in the tax code, the Legislature recognizes that producers bear the sole burden of post-production costs, yet my dissenting colleagues wish to judicially shift that burden to lessors (who would then receive no statutorily conferred tax benefits).

Third, the Legislature passed a statute in 2022 regulating the unitization of interests in horizontal oil and gas wells. The Legislature incorporated into the statute the *Wellman-Tawney* marketable-product rule and provided that the driller-operator of a certain, narrow class of wells was prohibited from deducting post-production expenses from the oil-and-gas owner's royalty.[16] Importantly, in crafting the unitization statute, the

---

"Lease operating expenses" means the actual costs incurred to bring the subsurface minerals (oil, natural gas, and natural gas liquids) up to the surface and convert them to marketable products. Lease operating expenses refers to the costs of operating the wells and equipment. "Lease operating expenses" includes actual costs of labor, fuel, utilities, materials, rent or supplies, which are directly related to the production, processing, or transportation of oil, natural gas, natural gas liquids, or any combination thereof and that can be documented by the producer.

W. Va. Code § 11-1C-10(d)(3)(B)(iv). The tax commissioner's regulations further outline the method by which the lessor's royalty interest is taxed equal to the percentage share of the lessor's royalty, while the producer's working interest is valued and taxed as "the fractional interest in oil production or natural gas production, or both, subject to development and operating expenses and owned by the . . . operator[.]" *See* 110 C.S.R. §§ 1J.3.52 and 3.59 (2023).

[16] The 2022 unitization statute, which was designed to encourage horizontal drilling but "[s]afeguard, protect, and enforce the correlative rights of operators and royalty owners of oil and gas in a horizontal well unit" recognizes that there may be "no lease in

8

Legislature expressly left the marketable-product rule in our case law unmolested when it said: "No provision of this section alters the common law of this state regarding the deduction of post-production expenses for the purpose of calculating royalty." W. Va. Code § 22C-9-7a(l) (2022).

In sum, since 2001, our Legislature has never impinged on this Court's adoption and clarification of the marketable-product rule. Since 2001, the Legislature has incorporated the marketable-product rule into at least three statutes. And, in one statute, the Legislature unquestionably stated its actions were not intended to alter the marketable-product rule discussed in *Wellman*, *Tawney*, and *Kellam*.

And then there is the executive branch of government. I noted in *Kellam* that West Virginia's executive "hews to the marketable-product rule for leases of oil and gas on State lands. The State's leases expressly provide that a lessee may not deduct the cost of putting oil and natural gas into a marketable condition from royalties due to the State of

---

existence" on a potentially valuable oil and gas property. In that case, various conditions must occur including that a production royalty must be paid to the mineral owner that is calculated in one of two ways: either "reflecting arm's-length, market-based sales, for natural gas . . . and shall not be reduced by post-production expenses" or a weighted average price of sales "to unaffiliated, third-party purchasers accessible by the owner's production, without deduction of post-production, third-party costs and expenses charged to or incurred by applicant and/or its affiliates[.]" W. Va. Code §§ 22C-9-7a(b)(11) and (f)(7)(B)(ii) (2022).

9

West Virginia[.]" *Kellam*, 247 W. Va. at 95, 875 S.E.2d at 233.[17] Moreover, the marketable-product rule is applied by the largest owner of mineral interests in the country: the United States government. "Federal regulations provide that, for leases on federal land, any gas produced must be marketed 'at no cost to the Federal government.'" *Id.* (citing 30 C.F.R. § 1206.146(a)). When the United States government is combined with the state jurisdictions that have adopted variations of the marketable-product doctrine, either by appellate court decision or statute, "far more than half of the nation's oil and gas production . . . follows a marketable-condition rule that requires the lessee to bear the cost of putting oil and natural gas into a marketable condition." *Kellam*, 247 W. Va. at 94, 875 S.E.2d at 232 (quoting John Burritt McArthur, *Oil and Gas Implied Covenants for the Twenty-First Century*, 237 (2014)).

---

[17] In my concurrence, I quoted from one of the oil-and-gas leases that the *Kellam* petitioner, SWN Production Company, had made with the State of West Virginia. That lease, for State land under the Ohio River, contained a paragraph saying:

> Production & Post-Production Costs. Neither Lessee, nor any Affiliate of Lessee, may reduce Lessor's royalty for any post-production expense, including, but not limited to, pipelines, surface facilities, telemetry, gathering, dehydration, transportation, fractionation, compression manufacturing, processing, treating, or marketing of the Granted Minerals, or any severance or other taxes of any nature paid on the production thereof. Royalties under this Lease shall be based on the total proceeds of sale of the Granted Minerals, exclusive of any and all production and/or post-production costs.

*Id.* at 78, 875 S.E.2d at 233 (footnote omitted).

10

My dissenting colleagues suggest that the majority opinion rewrote the parties' oil and gas lease "to reflect the Court's view of a fair bargain." But the facts as presented by the district court show that this lease is – like so many oil and gas leases – rife with ambiguities. There is "an axiom of contract law: an ambiguous document is always construed against the drafter." *Harrell v. Cain*, 242 W. Va. 194, 205, 832 S.E.2d 120, 131 (2019). Also called *contra proferentem*, we have long held that "[u]ncertainties in an intricate and involved contract should be resolved against the party who prepared it." Syllabus Point 1, *Charlton v. Chevrolet Motor Co.*, 115 W. Va. 25, 174 S.E. 570 (1934). *See also Nisbet v. Watson*, 162 W. Va. 522, 530, 251 S.E.2d 774, 780 (1979) ("It is also well settled that any ambiguity in a contract must be resolved against the party who prepared it.").

I have examined the record from the district court, and the majority opinion addresses the two questions precisely as they were presented by the district court: is there an implied duty to market oil and gas produced under an in-kind lease? And is the marketable-product rule implied into an in-kind lease? These questions are, however, divorced from the record and the facts. For instance, while this Court's opinion focused on the "in-kind" clause in the parties 1979 lease, there was no consideration of the clause saying that the lessee-producer was required to pay the royalty share to the lessor "free of cost." That "free of cost" phrase, to me, is certainly indicative of the parties to the lease intending that no production costs would be passed on to the lessor-royalty owner. Another

11

thing we do not know is, why did the parties to the 1979 lease adopt "in kind" language?[18]

Did the 1979 lessors understand they would not automatically receive cash royalties, or did the landman who secured their autographs on the lease assure them the language was a technicality, and they would surely receive a 1/8 royalty in cash?  The 1979 lease says that the lessee had the right to "build[] tanks, plants, stations, and structures" and to "lay[] pipe lines on, over and across the leased premises" – language which suggests that those facilities did not already exist on the tract and that the 1979 lessors had no equipment capable of collecting, storing, and transporting oil or gas.

How courts interpret the language of the 1979 lease is, in part, guided by the parties' course of conduct over the last forty-plus years.  Hence, this Court's opinion merely reflects the academic, sterile nature of the district court's questions.  But I will emphasize that it is a stretch, in light of the lease's "free of cost" language and lack of language suggesting the 1979 lessors could ever accept oil and gas in kind, for my

---

[18] My limited research suggests that, in the mid-1970s, oil and gas producers were "faced with dwindling supplies, sharply higher prices and curtailment."  Richard S. Morris, *Taking Royalty Gas in Kind*, 22 Rocky Mtn. Min. L. Inst. 25 (1976).  Regulation by the Federal Power Commission regarding royalties on gas sold to interstate customers was creating legal problems for producers: royalty owners noticed regulated interstate sales resulted in lower royalties than in-state sales and fought for the Commission to require producers to pay higher royalties regardless of which market bought the gas.  In response, producers sought to circumvent federal regulation by forcing "the lessor to take his royalty gas in kind," so that producers would no longer be burdened by complaints from royalty owners regarding the sales price obtained in the interstate market.  *Id.*

dissenting colleagues to insist that the lease *must* be interpreted to include a requirement that any royalties are subject to costs incurred by the producer.

In conclusion, I respectfully concur with the majority opinion.